THE INDEPENDENT ORDER OF
FORESTERS, Plaintiff–
Appellant,

v.

DONALD, LUFKIN & JENRETTE, INC.,
Donaldson, Lufkin & Jenrette Securities
Corporation, and Martha Heintz Walsh,
as executor of the last will of Daniel
Walsh, Defendants–Appellee.

No. 1721, Docket 97–9266.

United States Court of Appeals,
Second Circuit.

Argued May 4, 1998.

Decided Oct. 7, 1998.

Edward C. Cerny, III, New York City (Lane & Mittendorf) for Plaintiff–Appellant

Michael R. Lazerwitz, Washington, DC (Cleary, Gottlieb, Steen & Hamilton) for Defendant–Appellee, Donald, Lufkin & Jenrette, Inc. and Defendant–Appellee, Donaldson, Lufkin & Jenrette Securities Corporation.

Anthony Mansfield, and Laura M. Franco, New York City (Seward & Kissell) for Defendant–Appellee, Martha Heintz Walsh.

Before: PARKER, FEINBERG, and PHILLIPS *, Circuit Judges.

PHILLIPS, Circuit Judge:

In this diversity action, International Order of Foresters ("IOF") sued Donald, Luf-

kin & Jenrette, Inc. and Donaldson, Lufkin & Jenrette Securities Corporation (collectively "DLJ") on multiple New York common law claims growing out of losses suffered by IOF on securities purchased from DLJ. Two sets of claims were alleged in original and amended complaints. The original pleaded set, invoking a number of legal theories, centered on alleged misrepresentations and warranties made by DLJ in negotiations leading to the purchase of the securities. A later added set, also invoking a number of legal theories, centered on the alleged "commercial bribery" by DLJ of a key IOF investment officer who, as intended, counseled purchase of the misrepresented securities in return for "kickbacks" paid him by DLJ. Following discovery and pre-trial motion proceedings, the district court dismissed all of IOF's claims for failure to state a claim under Fed.R.Civ.P. 12(b)(6) or for summary judgment under Fed. R.Civ.P. 56(c).

On this appeal, IOF challenges the district court's order dismissing its claims as a matter of law, various of the court's discovery rulings, and the court's denial of its pre-trial recusal motion. We affirm the court's discretionary discovery and recusal rulings and its dismissal of all the claims other than that based on allegations that DLJ induced IOF's investment officer to breach his fiduciary duty to IOF. As to that claim, we conclude that there are genuine issues of material fact which precluded its dismissal as a matter of law. Accordingly, we vacate that portion of the judgment and remand that claim for further proceedings.

## I. BACKGROUND

### A. Facts

IOF is a fraternal benefit society located in Ontario, Canada, that issues life, accident and health policies and annuities for and to its members. The district court found, and neither party disputes on appeal, that at the relevant times, IOF was a large commercial entity with over one million members, offices in Canada, the United States, England and Ireland, that engaged in substantial investment transactions under a professionally-

* The Honorable James Dickson Phillips, Jr., of the United States Court of Appeals for the Fourth Circuit, sitting by designation.

staffed investment department. In 1989, its total investments in bonds, stocks and mortgages were valued at $2.032 billion Canadian and during that year its investment department purchased and sold securities of all types in more than 100 transactions that involved over $1 billion in total value based on net sale and purchase prices.

DLJ is located in New York and engages in the business of buying and selling securities, including the issuance, underwriting and marketing of collateralized mortgage obligation derivative securities ("CMOs").

Over an eleven-month period, from May, 1989 to April, 1990, IOF purchased from DLJ a number of CMOs among which were twelve having a total purchase price of over $120 million,[1] on which IOF suffered losses of over $14 million upon their later disposition.

From the 1960's until his death in 1990, William E. Boothe was Vice President–Investments and Fixed Income Manager of IOF and in that capacity was responsible, subject to the approval of IOF's Investment Board, for selecting appropriate securities, including CMOs for IOF's investment portfolio.

From 1981 until 1989, Daniel Walsh, while employed by L.F. Rothschild & Co., Inc., advised IOF, through Boothe, on investment matters. Following his move in 1989 to DLJ's employ, Walsh continued to advise IOF through Boothe until the latter's death in 1990.

On April 19, 1989, Walsh set up a DLJ trading account which identified IOF as "Master Client Name" but in which Boothe had the sole beneficial interest (the "IOF–Boothe account"). Through this nominal IOF account, Boothe conducted during 1989 a number of profitable transactions with DLJ that were not reported to or known to IOF. Without any notice to IOF, DLJ closed the account on March 26, 1990, seven days after Boothe's death. IOF did not learn of the account's existence until March 17, 1995.

### B. Litigation

On April 14, 1995, IOF sued DLJ, alleging breach of warranty, mutual mistake, breach of fiduciary relationship, negligent misrepresentation, and reckless or fraudulent misrepresentation, all in conjunction with the twelve CMO transactions. In due course, DLJ moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), and to stay discovery pending disposition of the motion to dismiss. On August 23, 1995, a magistrate judge stayed discovery for three months and later extended the stay another three months. On March 13, 1996, the district court entered an order dismissing on the merits all of IOF's claims, except the claim for breach of warranty, and ordering that discovery close on June 3, 1996. On May 31, 1996, having obtained leave of the court, IOF filed an amended complaint, repleading with some modifications all of the original claims except negligent misrepresentation, adding new claims, and joining the estate of Daniel Walsh as a defendant. Specifically, the amended complaint alleged nine repleaded and new claims: (1) breach of warranty; (2) breach of implied covenant of good faith and fair dealing; (3) money had and received; (4)

---

**1.** The twelve purchases at issue were:

| | Trade Date | Settlement Date | Security | Purchase Price |
|---|---|---|---|---|
| 1. | 4/26/89 | 5/31/89 | DLJ 2 89–R | $20,221,052.08 |
| 2. | 6/1/89 | 6/30/89 | FHLMC 54–H | $13,276,861.33 |
| 3. | 6/1/89 | 6/30/89 | DLJ 2 89–F | $2,875,320.00 |
| 4. | 7/21/89 | 8/30/89 | FHLMC 75 R | $7,500,000.00 |
| 5. | 7/21/89 | 8/30/89 | FHLMC 75 RS | $7,500,000.00 |
| 6. | 10/11/89 | 11/30/89 | FHLMC 100 N | $15,056,250.00 |
| 7. | 11/21/89 | 12/29/89 | FHLMC 113 R | $7,650,058.44 |
| 8. | 11/21/89 | 12/29/89 | FHLMC 113 RS | $7,650,058.44 |
| 9. | 11/28/89 | 12/29/89 | FHLMC 23 K | $4,616,982.83 |
| 10. | 12/12/89 | 12/29/89 | FHLMC 19 L | $3,700,000.00 |
| 11. | 3/13/90 | 4/30/90 | FHLMC 159 R | $12,473,942.00 |
| 12. | 3/13/90 | 4/30/90 | FHLMC 159 RS | $12,473,942.00 |

(J.A. 104–12, 669.)

mutual mistake of fact; (5) unilateral mistake of fact; (6) breach of fiduciary relationship; (7) inducing or participating in a breach of fiduciary duty; (8) breach of duty of loyalty; and (9) reckless and fraudulent misrepresentation. As now pleaded, all of these claims invoked one or the other or both of two conceptually distinct legal/factual theories of liability.

One theory rested on core factual allegations that the CMOs did not perform as promised or as falsely represented by DLJ in the sales brochures and a "Derivative Portfolio" that it used in marketing the CMOs. This was the basis, in whole or part, for the claims of breach of warranty, breach of implied covenant of good faith and fair dealing, money had and received, breach of fiduciary duty, unilateral and mutual mistake of fact, and fraudulent misrepresentation.

The other theory rested on core factual allegations that DLJ, through Walsh, "commercially bribed" Boothe by making "kickback" payments to him through the concealed IOF–Boothe account. This was the basis, in whole or part, for the claims of breach of implied covenant of good faith and fair dealing, money had and received, breach of fiduciary duty, inducing breach of fiduciary duty, and breach of duty of loyalty.

The complaint sought damages on the claims for breach of warranty, breach of implied covenant of good faith, money had and received, inducing breach of fiduciary duty, and fraudulent misrepresentation; it sought rescission on the claims of unilateral and mutual mistake of fact; and it sought an accounting and a constructive trust on the claims for breach of fiduciary relationship and breach of duty of loyalty.

After DLJ indicated that it would move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) or for summary judgment, IOF unsuccessfully sought to extend the then-expired discovery period. IOF then unsuccessfully moved for recusal of the district judge. In June, 1997, IOF renewed its request to reopen discovery, which the district court denied. On September 5, 1997, the district court dismissed all of

IOF's claims on DLJ's Rule 12(b)(6), 56(c) motion.[2]

This appeal by IOF followed. Walsh's Executor has adopted DLJ's appellee's brief in defending the appeal.

## II.

### A. Standards of Review

 To the extent the district court's dismissal of claims was under Fed.R.Civ.P. 12(b)(6) we review it *de novo,* taking all well-pleaded factual allegations as true and drawing all reasonable inferences in IOF's favor. *See Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir. 1996). To the extent it was by summary judgment, we also review *de novo* to determine whether there is on the record any genuine issue of material fact and if not, whether DLJ was entitled to judgment as a matter of law. *See Catlin v. Sobol,* 93 F.3d 1112, 1116 (2d Cir.1996). Because neither party takes issue with the district court's stated assumption that all the materials relevant to its decision were properly before it either as integral to the complaint or as properly presented for summary judgment ruling, we proceed on the same assumption in reviewing the dismissal order. We review the discovery and recusal rulings for abuse of discretion. *See Apple v. Jewish Hosp. & Med. Ctr.,* 829 F.2d 326, 333 (2d Cir.1987) (recusal); *Goetz v. Crosson,* 41 F.3d 800, 805 (2d Cir.1994) (discovery).

### B. Dismissal of IOF's Claims

#### 1. Claims based solely on DJL's negotiation conduct

##### a. Breach of warranty

 This claim was that by statements made in its offering brochures ("Brochures") and a later document styled "Derivative Portfolio" ("Portfolio"), DLJ had expressly warranted to IOF that if purchased in recommended combinations, the twelve CMOs in issue would outperform Treasury notes within in a specified range of interest rates. It is

---

2. The district court noted that some of the re-pleaded claims had earlier been dismissed on the merits and that leave to replead them had not been given, but the court nevertheless addressed them.

undisputed that the CMOs did not perform as allegedly warranted.

The district court dismissed this claim on two legal grounds: (1) that the statements alleged to be warranties were only "puffery and expressions of opinion," and "not express warranties," and (2) that, in any event, the statements were made before and never incorporated into any enforceable contract of sale. (J.A. at 755–57.)

We affirm that ruling on the second ground, and for the following reasons.

■ An express warranty arises as to securities being purchased when the seller directly affirms the quality or condition of the investment, the affirmation tends to induce the buyer's purchase, and the buyer purchases relying upon it. *See Shippen v. Bowen,* 122 U.S. 575, 7 S.Ct. 1283, 30 L.Ed. 1172 (1887). Here, the Portfolio was not created until April, 1990, after all but two of the twelve transactions at issue were consummated. Representations in the Portfolio therefore could not have induced transactions that occurred before the Portfolio had been created. In any event, neither the Portfolio nor the Brochures, alone or together, could have formed the basis for enforceable agreements between the parties, and the buy-sell agreements finally consummated expressly disclaimed any intention that earlier representations should have any legal effect.

To explain this legal conclusion requires a description of DLJ's customary process for marketing CMOs as known in the trade at relevant times and as used in the transactions at issue. DLJ's process began by developing a possible structure for the investment. (J.A. 191.) Once the hypothetical structure was created, DLJ gauged customer interest in the investment by preparing and circulating brochures to potential buyers. (*Id.* at 192.) The brochures contained "a few bullet-points" describing only "the basic elements of [the] hypothetical structure." (*Id.*) Since the brochures predated the actual creation of the security, they

> frequently did not identify such basic information as the original face amount or principal amount of the proposed security; the formula for determining interest coupons; the asking price for the security or the closing date for the securitization of the overall deal; the settlement date for the security; nor any other pricing information with respect to the proposed security.

(*Id.*) With one exception, all of the Brochures at issue here conformed to this general format.[3]

The fact that a brochure had been prepared for a security did not guarantee that the security would be created or that it would be created as described. (*Id.* at 193.) Based on customer response, DLJ might modify the security or decide not to create it at all. (*Id.*) Having received the brochures, potential customers notified DLJ of their interest in the security. (*Id.*) In at least one of IOF's transactions with DLJ, IOF indicated its interest by submitting a letter of intent to DLJ. (*Id.* at 335.) If DLJ decided to go ahead and create the security, it produced an Offering Circular or Prospectus, providing a detailed description of the "nature and final structure of [the] security." (*Id.* at 193–94.)[4] Generally, Offering Circulars or Prospectuses were forwarded to the customer a week or so before settlement date, (*id.* at 327–29), the date on which the sale was consummated. (*Id.* at 194.) Until settlement date, the buyer

---

3. In one Brochure, the proposed securities were specifically identified as "FHLMC 54–H" and "DLJ 2–F" and a price was listed for each. (*Id.* at 537.) IOF did not purchase a security identified as "DLJ 2–F." Rather, IOF purchased a security identified as "DLJ 2 89–F." (*Id.* at 105, 669.)

Like the Brochures, the Portfolio is a barebones document. The Portfolio was created by DLJ in April, 1990 in response to a request from IOF's new investment officer to provide him with information regarding IOF's CMO holdings. Excluding the title page, the document is ten pages in length and consists of seven graphs showing projected returns, a chart summarizing IOF's holdings, and a number of bullet points of text. (*Id.* at 137–47.) The information regarding FHLMC 159 R and FHLMC 159 RS, the only investments purchased *after* the Portfolio was created, is confined to one page. That page also describes FHLMC 75 R and FHLMC 75 RS and consists of a graph entitled "Total Realized Return" and five bullet points. (*Id.* at 143.)

4. Offering Circulars are prepared for securities issued by the Federal Home Loan Mortgage Corporation ("FHLMC"). (*Id.* at 193.) Prospectuses are prepared for securities issued by entities other than the FHLMC. (*Id.* at 193–94.)

was free to cancel his proposed purchase. (*Id.* at 235–36.)

In the transactions at issue here, the Offering Circulars and Prospectuses expressly warn of the interest rate and prepayment risks associated with the investments. One prospectus stated, for example, that yields are "highly sensitive" to the prevailing interest rate and the rate of principal payments (including prepayments) on the underlying mortgages and that "[h]igh prevailing levels of the Inflation Rate and/or a rapid rate of principal payments ... will materially decrease the yield to Investors...." (*Id.* at 452 (emphasis in original).) The document further warned that investors "should fully consider the associated risks, including the risk that high prevailing levels of the Inflation Rate and/or a rapid rate of principal payments ... could result in the failure of investors ... to recoup their initial investment." (*Id.* (emphasis in original).) And, it further stated that "[n]o representation is made as to the anticipated rate of prepayments on such mortgage loans, any anticipated levels of the Inflation Rate or the anticipated yield to maturity...." (*Id.* (emphasis in original).) The Offering Circulars contained similar warnings. (*See, e.g., id.* at 381). Finally, both the Offering Circulars and the Prospectuses disavowed any intended legal effect for any outside representations. The Offering Circulars stated: "No dealer, salesperson or other person has been authorized to give any information or to make any representations ... other than those contained in this Offering Circular ..., and if given or made, such information or representations must not be relied upon as having been authorized...." (*Id.* at 382, 389, 404, 411, 432, 443 (emphasis in originals).) Similarly, the Prospectuses stated: "No person has been authorized to give any information or to make any representations

other than those contained in this Prospectus Supplement and the accompanying Prospectus in connection with the offer made hereby, and, if given or made, such information or representations must not be relied upon." (*Id.* at 401 (emphasis in original).) [5]

Viewing the negotiations as a whole, we conclude as a matter of law that the Offering Circulars and Prospectuses constituted the first communications between the parties having the requisite degree of specificity and definiteness to constitute valid offers. *See Concilla v. May,* 214 A.D.2d 848, 849, 625 N.Y.S.2d 346, 348 (3d Dep't)("It is recognized that an offer is the manifestation of willingness to enter into a bargain and that it must be definite and certain."); *see also* 1 Richard A. Lord, Williston on Contracts § 4:18, at 414 (4th ed. 1990)("It is a necessary requirement that an agreement, in order to be binding, must be sufficiently definite to enable the courts to give it an exact meaning."); Restatement (Second) of Contracts § 33(1) (1981)("Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.").[6] IOF accepted the terms proposed by DLJ in the Offering Circulars and Prospectuses by choosing to go forward to settlement instead of exercising its option to cancel. Thus, the Offering Circulars and Prospectuses, and not the Brochures, define the consummated buy-sell agreements between the parties. The Offering Circulars and Prospectuses do not contain any warranties and expressly disavow any outside representations. Representations made in the Brochures and Portfolio, therefore, could not constitute enforceable warranties incident to contractual agreements between the parties. IOF's breach of express warranty claim was therefore properly dismissed.

5. Like the Offering Circulars and Prospectuses, the Portfolio contained cautionary language. On its first and last pages, the Portfolio warned: "The analyses, calculations and valuations contained herein are based on data and assumptions DLJ believes to be accurate. DLJ provides no assurance that these items are accurate or represent levels where actual trades may occur." (*Id.* at 138, 147.) Sidney Harris, the IOF investment officer who purchased the final two CMOs from DLJ, testified that he understood this language to

be a "disclaimer," meaning that DLJ had "no responsibility that what they're telling you is complete and accurate." (*Id.* at 224–25.)

6. As indicated, in one Brochure, the proposed securities were identified and prices were specified. However, given the course of conduct between the parties that developed over numerous securities transactions, this Brochure cannot be considered to be an offer.

b. Unilateral and mutual mistake of fact

■ The gravamen of these claims was that both parties proceeded to contract under material mistakes of fact respecting the performance predictions made by DLJ in the Brochures and Portfolio. The district court dismissed both claims on various grounds, including that the remedy sought, rescission, was not available in view of IOF's sale of all the CMOs at issue. Without disavowing any of the district court's stated grounds for decision, we affirm its dismissal of these claims for the following reason. As a basic proposition, a contract is made voidable by either unilateral or mutual mistake only where the asserted mistake concerns "a basic assumption on which the contract was made." Restatement (Second) of Contracts § 152 (mutual mistake); *id.* § 153 (unilateral mistake). Given the fact that, as earlier noted, the contract here in issue expressly disavowed any legal effect for representations made in the Brochures or Portfolio, they could not have constituted "basic assumptions" as to which contract-avoiding mistakes could have been made—either by IOF unilaterally or by the parties mutually.

The district court properly dismissed these claims.

c. Reckless and fraudulent misrepresentations

■ This claim, based on the alleged misrepresentations of anticipated CMO performances in the Brochures was dismissed by the district court for lack of reasonable reliance by IOF. We affirm.

■ The familiar elements of a fraudulent misrepresentation claim are that: (1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank,* 57 F.3d 146, 153 (2d Cir.1995) (applying New York law). Here, just as they precluded recovery for breach of warranty, the warnings in the Offering Circulars and Prospectuses regarding the risks associated with the investments and the provisions in those documents disavowing any outside representations preclude a finding that IOF reasonably relied upon them in purchasing the CMOs. The district court properly dismissed this claim on that basis.

2. Claims based in whole or part on payments made to Boothe

a. Money had and received

■ The district court dismissed this claim on the basis that quasi contract does not lie where, as here, there is a valid contract between the parties respecting the matter at issue. We affirm the dismissal on that basis. *See Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388–89, 516 N.E.2d 190, 193, 521 N.Y.S.2d 653, 656 (1987).

b. Breach of fiduciary duty

■ In this claim, IOF alleged that by reason of DLJ's greatly superior sophistication and knowledge of the subject matter, their broker-customer relationship gave rise to a fiduciary duty on DLJ's part that was breached both by DLJ's failure properly to advise IOF of the risks associated with the CMO purchases and by the concealed payments to Boothe. The district court dismissed this claim on the basis that, as a matter of law, the broker-customer relationship created no general fiduciary duty that could be breached in either of the ways alleged. We agree.[7]

■ Under New York law, as generally, there is no general fiduciary duty inherent in an ordinary broker/customer relationship. *See Perl v. Smith Barney Inc.,* 230 A.D.2d 664, 666, 646 N.Y.S.2d 678, 680 (1st Dep't). Such a duty can arise only where the customer has delegated discretionary trading authority to the broker. *See Press v. Chemical Inv. Servs. Corp.,* 988 F.Supp. 375, 386–87 (S.D.N.Y.1997). IOF's accounts with DLJ were not, however, discretionary and where the customer maintains a nondiscretionary account, the broker's duties are quite limited.

---

7. The district court held, and we agree, that the "breach of loyalty" claim, as pleaded, was not conceptually different from the breach of fiducia-ry duty claim and should be dismissed for the same reason.

For example, where the terms of a nondiscretionary account require the customer's authorization on all transactions, a broker has a fiduciary duty to notify the customer before making sales. *See Conway v. Icahn & Co.,* 16 F.3d 504, 510 (2d Cir.1994). And, a broker on a nondiscretionary account has the duty to execute requested trades. *See Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir.1991). But IOF's claim relates to no such limited duties and its nondiscretionary account did not give rise to the much broader, general fiduciary duty on which the claim depends. The district court therefore properly dismissed the claim as it pertained both to DLJ's negotiation conduct and to its concealed payments to Boothe.

### c. Breach of implied covenant of good faith and fair dealing

█ In this claim, as in the breach of fiduciary duty claim, IOF alleged breach of the implied covenant both by DLJ's negotiation conduct and by its concealed payments to Boothe. In addition to challenging as a matter of law the existence of such an implied covenant, DLJ raised by its summary judgment motion a statute of limitations defense.

The district court, expressing reservations as to whether under New York law such an implied covenant can be found except in respect of ongoing duties imposed by an executed contract, *see, e.g., Bissell v. Merrill Lynch & Co.,* 937 F.Supp. 237, 247–48 (S.D.N.Y.1996), nevertheless thought that two state court decisions indicated that such an implied covenant might arise from bribes given not to influence contract performance, but to induce its execution.[8] Accordingly, the court held that to the extent the breach of covenant claim was based upon the concealed payments to Boothe, the claim was a viable one. But, the court then held, cryptically, that the claim was barred by the applicable state statute of limitations. (J.A. at 760).

We believe the claim should have been dismissed on the basis that, as the district court recognized might be the rule, such an implied covenant relates only to the performance of obligations under an extant contract, and not to any pre-contract conduct. The two state court decisions which the district court thought might recognize a pre-contract bribery exception to this general rule seem to us doubtful authority for that proposition.

We therefore affirm dismissal of this claim on the ground that the implied covenant of good faith and fair dealing does not apply to any of the pre-contract conduct on which the claim was based.[9]

### d. Inducing breach of fiduciary duty

In this claim, rested solely on the allegations of DLJ's concealed payments to Boothe, IOF alleged that, as intended, the payments suborned Boothe's breach of fiduciary duty to IOF by causing him to select the CMOs on which IOF sustained loss. By its summary judgment motion, DLJ contended that IOF's allegations and supporting materials would not support the inference that DLJ's payments into the IOF–Boothe account constituted "bribery," or that, even if so, they caused the CMO purchases and resulting loss to IOF. In addition, DLJ raised a statute of limitations defense to the claim, contending that because the last alleged bribe payment was made on December 7, 1989, and the claim was first made by amended complaint on May 31, 1996, it was barred by New York's three-year statute, N.Y. C.P.L.R. § 214(4) (McKinney 1998). Responding, IOF contended that the applicable limitations period was the six-year default period provided by N.Y. C.P.L.R. § 213(1), and that because the amended complaint should relate back under Fed.R.Civ.P.

---

8. *See American Assurance Underwriters Group, Inc. v. MetLife Gen. Ins. Agency, Inc.,* 154 A.D.2d 206, 552 N.Y.S.2d 259 (1st Dep't 1990); *Black v. MTV Networks, Inc.,* 172 A.D.2d 8, 576 N.Y.S.2d 846 (1st Dep't 1991), *appeal dismissed by,* 79 N.Y.2d 915, 590 N.E.2d 252, 581 N.Y.S.2d 667 (1992).

9. To the extent there is any uncertainty on this point in the relevant New York decisions, it need

not concern us as a practical matter. It is clear that even if at odds with our stated understanding such a claim would lie on the bribery allegations, it would be wholly redundant of the claim for inducing a breach of fiduciary duty that, as we next hold, is clearly a cognizable one on the facts alleged—subject of course to proof and defenses.

15(c) to the filing of the original complaint on April 14, 1995, the claim was timely filed. Alternatively, IOF contended that the claim was saved by equitable tolling based upon DLJ's deliberate concealment from IOF of the IOF–Boothe account, the payments made through it to Boothe, and its unilateral cancellation following Boothe's death.

The district court, finding the three-year statute applicable, dismissed the claim as time-barred. It gave short shrift to the relation-back and equitable estoppel contentions. The former was rejected without discussion; the latter, on the basis of IOF's lack of diligence in bringing the claim. (J.A. 759 n. 11, 760 n. 12.)

IOF contends on appeal that the district court erred in dismissing this claim by summary judgment on statute of limitations grounds. DLJ defends the dismissal on that ground and, alternatively, on the ground, raised below, that the necessary causal connection between the Boothe payments and the CMO purchases could not be inferred on the summary judgment record. We agree with IOF that on the record we review there are genuine issues of material fact that preclude dismissal either on statute of limitations or causal connection grounds.

### (1) Statute of limitations

■ Initially, we agree with the district court that the applicable statutory period for this claim is the three-year period provided by N.Y. C.P.L.R. § 214(4). Applying the rule that "choice of the applicable Statute of Limitations depends on the substantive remedy which the plaintiff seeks," *Loengard v. Santa Fe Indus., Inc.,* 70 N.Y.2d 262, 266, 514 N.E.2d 113, 115, 519 N.Y.S.2d 801, 803 (1987), a breach of fiduciary duty claim seeking money damages to compensate for the decline in the value of investments has been held subject to this three-year statute. *See Geren v. Quantum Chem. Corp.,* 832 F.Supp. 728, 735–36 (S.D.N.Y.1993). We see no reason why this rule should not apply to a claim

seeking monetary relief for inducing a breach of fiduciary duty such as IOF's. This being the applicable limitations period, IOF's claim is time-barred as a matter of law unless saved by relation-back or estoppel.

DLJ's last alleged act of bribery occurred, at the latest, on December 7, 1989, the settlement date of the final trade in the IOF–Boothe account. The last CMO purchases settled on April 30, 1990. The amended complaint was not filed until May 31, 1996. Regardless of whether the statute of limitations began to run in December of 1989 or April of 1990, IOF's claim is therefore untimely.

Since the original complaint was not filed until April 14, 1995, it too was filed outside the applicable limitations period and relation back under Rule 15(c), even if otherwise appropriate, could not save the claim.

■ Whether it may be saved, however, by equitable tolling, is another matter. On that, we believe there are genuine issues of material fact that made erroneous on a summary judgment motion the district court's rejection of this basis for avoiding the limitations defense.

■ Under New York law, as generally, a party may be estopped from raising a statute of limitations defense where his fraud, concealment, or deception prevented the plaintiff from timely filing his claim. *See Simcuski v. Saeli,* 44 N.Y.2d 442, 448–49, 377 N.E.2d 713, 716, 406 N.Y.S.2d 259, 262 (1978). Here, undisputed facts on the summary judgment record reveal the following.

In 1989, Boothe engaged in at least six "trades" in the IOF–Boothe account through DLJ, netting a profit of $33,860. (J.A. at 598.) The trades were "day trades" in corporate bonds; the face amount of the bonds involved in each trade equaled $2,000,000.00. DLJ did not require Boothe to put up any of his own money to effect the trades and every trade resulted in a profit. (*Id.* at 593, 598–99.)[10] IOF has no record of receiving the proceeds from the trades. (*Id.* at 583.)

---

**10.** The specific trades and the profits associated with each include:

1. $2,000,000.00 par value Federal Express 9–3/4% Debentures. Settlement date: May 25, 1989. Profit: $6,000.00;

2. $2,000,000.00 par value Connecticut Light & Power 9–1/2% Debentures. Settlement date: June 14, 1989. Profit: $5,000.00;

3. $2,000,000.00 par value Bank of Nova Scotia 9% Debentures. Settlement date: October 3, 1989. Profit: $2,500.00;

Although the IOF–Boothe account was opened in the name of IOF, IOF has no record of the account. (*Id.*) DLJ's Compliance Manual requires that before opening any corporate cash account, it must have a corporate resolution authorizing the account and designating at least two corporate officers who have authority to place orders, transact business, and issue instructions regarding the account. (*Id.* at 595.) So far as appears, DLJ did not obtain the required resolution. (*Id.* at 596.) Also, according to DLJ's Compliance Manual, DLJ should have sent duplicate confirmations of the trades to IOF. (*Id.* at 596.) IOF has no record of receiving duplicate confirmations. (*Id.* at 583.) DLJ closed the IOF–Boothe account on March 26, 1990, seven days after Boothe's death. (*Id.* at 603.) IOF never instructed DLJ to take this action. (*Id.* at 583.) When pressed at oral argument on this appeal as to why DLJ closed the account, counsel for DLJ responded only that there was no explanation in the record.

In every year relevant to IOF's bribery allegation, Boothe signed an IOF Code of Ethics statement indicating that neither he nor his family received any article of value or cash from any organization doing business with IOF. (*Id.* at 562–67.) IOF did not learn of the IOF–Boothe account until March 17, 1995. (*Id.* at 679.)

Based on these undisputed facts, we conclude that there is a genuine issue of material fact regarding whether, by the process used by DLJ's agents in opening, using and finally closing the IOF–Boothe account without authorization or explanation, DLJ concealed the very existence of the account and thus prevented IOF from timely filing its bribery-related claim.

DLJ suggests that equitable estoppel cannot apply because IOF failed to exercise due diligence in filing its amended complaint after learning of the IOF–Boothe account. *See generally Simcuski*, 44 N.Y.2d at 450, 377 N.E.2d at 717, 406 N.Y.S.2d at 263 ("due diligence on the part of the plaintiff in bring-

ing his action is an essential element for the applicability of the doctrine of equitable estoppel"). It is undisputed that IOF did not discover any information regarding the IOF–Boothe account until March 17, 1995. According to IOF's counsel (as stated in a sworn affidavit) the initial information obtained regarding the IOF–Boothe account was insufficient, in light of counsel's obligations under Fed.R.Civ.P. 11, to immediately assert a bribery claim. (J.A. 679.) Instead, after learning of the existence of the account, counsel for IOF, on May 3, 1995, served a Fed.R.Civ.P. 34 document demand on DLJ, requesting all records concerning the transactions in the IOF–Boothe account. (*Id.* at 679–80.) In the spring of 1996, IOF obtained the requested documents, which it determined would support a bribery claim. (*Id.* at 680.) The amended complaint was filed on May 31, 1996. We think these facts of record create a genuine issue of material fact regarding IOF's due diligence in filing this claim. With both DLJ's deliberate concealment of the facts necessary to support the claim and IOF's diligence in pursuing it once discovered thus in genuine issue, the district court erred in deciding the equitable estoppel issue against IOF as a matter of law.

### (2) The merits

■ DLJ contends, as an alternative basis for affirming dismissal of this claim, that as a matter of law on the summary judgment record, it could not be inferred either that the payments into the IOF–Boothe account were "bribes," or that they induced the CMO purchases and resulting loss to IOF. We disagree.

■ The elements of a claim for inducing breach of fiduciary duty under New York law are: (1) a breach by a fiduciary of obligations to another; (2) that the defendant knowingly induced or participated in the breach; and (3) that the plaintiff suffered damages as a result of the breach. *See Whitney v. Citi-*

4. $2,000,000.00 par value of Texas Utilities Electric Company 9–7/8% First Mortgage Bonds. Settlement date: November 14, 1989. Profit: $4,420.00;

5. $2,000,000.00 par value of New Jersey Bell Telephone 7.85% Debentures. Settlement

date: November 16, 1989. Profit: $10,000.00; and

6. $2,000,000.00 par value Hydro Quebec 8–1/2% Debentures. Settlement date: December 7, 1989. Profit: $5,940.00.

(*Id.* at 598–99.)

*bank, N.A.,* 782 F.2d 1106, 1115 (2d Cir. 1986). DLJ first contends that it could not reasonably be inferred from the summary judgment materials before the court that the six transactions in the IOF–Boothe account were causally connected to the CMO purchases, given the hundreds of other trades Boothe executed with DLJ during the same period. We disagree. The record discloses a close temporal link between the DLJ "deposits" into the IOF–Boothe account and most of the CMO transactions at issue here. Specifically, the record reveals that: (1) on May 25, 1989, DLJ deposited $6,000 into the IOF–Boothe account; one week later, on June 1, 1989, Boothe purchased FHLMC 54–H and DLJ 2 89–F; on June 14, 1989, two weeks before settlement of the CMOs, DLJ deposited another $5,000 into the IOF–Boothe account; (2) on October 3, 1989, DLJ deposited $2,500 into the IOF–Boothe account; one week later, Boothe purchased FHLMC 100N CMO; (3) on November 14, 1989, DLJ deposited $4,420 into the IOF–Boothe account; one week later, Boothe purchased FHLMC 113 R and FHLMC 113 RS; (4) on November 16, 1989, DLJ deposited $10,000 into the IOF–Boothe account; twelve days later, Boothe purchased FHLMC 23 K; and (5) on December 7, 1989, DLJ deposited $5,940 into the IOF–Boothe account; five days later, Boothe purchased FHLMC 19 L. (J.A. 598–99, 669.) While this temporal connection might be found purely coincidental or otherwise irrelevant to the asserted bribery of Boothe, we conclude that it suffices to create a genuine issue of material fact as to the requisite causation element.

DLJ also contends that the summary judgment materials would not support a finding that the payments into the IOF–Boothe account were in any event intended and made to induce Boothe to purchase the CMOs. Again, we disagree. The following facts are undisputed on the record. Although the ac-

count was set up in IOF's name, the formalities for establishing such an account were not followed. IOF never received duplicate confirmations of the trades. Boothe was allowed to make the trades without putting up any funds. Every trade resulted in a "profit." There was a close temporal link between a number of the CMO purchases and the deposits into the account. The account was closed, without instruction from IOF, seven days after Boothe's death. Again, a finder of fact might well determine that these facts were explainable on grounds not indicative of bribery, but we conclude that they raise genuine issues respecting the matter that made summary judgment improper.[11]

C. *Discovery rulings*

We have carefully considered IOF's contention that the district court erred in various of its discovery rulings and we conclude that there was no abuse of discretion in any of the rulings. Whether further discovery related to the claim we remand should be allowed, if sought, is not before us.

D. *Recusal rulings*

Finally, we consider IOF's challenge to the district judge's refusal, on IOF's motion, to recuse herself on IOF's supported assertion that the judge's former husband, while an employee of DLJ, had engaged in improper business practices that led to termination of his employment by DLJ, a criminal conviction, and disbarment.

28 U.S.C. § 455(a) provides: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (1993). "[J]udges determine appearance of impropriety ... by examining the record facts and the law, and then deciding whether

---

11. Not before us is the issue of the form and measure of any monetary relief to which IOF would be entitled were it to prove that the payments to Boothe were, as intended, bribes that induced his purchase of the CMOs. In its argument on the merits of this claim, DLJ seems to contend that monetary relief would be confined to compensatory damages for any loss that IOF could prove was caused by the induced purchase of the CMOs, and that the loss undoubtedly suf-

fered could not be so causally connected. (Appellees' Br. at 34.) Without regard to whether such a causal connection between proven bribe and undisputed loss could be proven on the facts of this case, a matter on which we express no opinion, we observe that, at odds with DLJ's apparent contention, some measure of restitutionary relief might be recoverable whether or not compensatory relief was. *See generally* Restatement of Restitution § 138(2) (1937).

a reasonable person knowing and understanding all the relevant facts would recuse the judge." *Securities & Exchange Comm'n v. Drexel Burnham Lambert Inc. (In re Drexel Burnham Lambert Inc.)*, 861 F.2d 1307, 1313 (2d Cir.1988).

In declining to recuse herself, the district judge opined for the record that:

> The facts cited in the Plaintiff's papers do not describe a situation where "impartiality might reasonably be questioned." The facts cited occurred a decade ago, and years before the herein alleged incidents. The Court has absolutely no knowledge of the facts alleged herein and the facts cited by the Plaintiff do not affect the present action. The Court finds that the facts cited by the Plaintiff in no way affect the Court's judgment or partiality in this case towards either party.

(J.A. 586.) We find no abuse of discretion in this ruling. *See Apple*, 829 F.2d at 333.

### III.

For the reasons given, we affirm the district court's judgment and interlocutory rulings in all respects challenged save that portion of the judgment that dismissed with prejudice IOF"s claim that DLJ and Walsh induced a breach by Boothe of his fiduciary duty to IOF. We vacate that portion of the judgment and remand that claim for further proceedings.