# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JIGGY PUZZLES, LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | **C.A. No. N24C-10-212 PRW** |
| | ) | **CCLD** |
| STEELHEAD ACQUISITION EE, INC. AND AESTUARY, INC, | ) | |
| | ) | |
| Defendants/Counterclaim Plaintiffs | ) | |

Submitted: January 14, 2026
Decided: February 18, 2026

*Upon Defendant/Counterclaim Plaintiff Aestuary. Inc.'s*
*Motion for Summary Judgment,*
**DENIED.**

*Upon Defendant/Counterclaim Plaintiff Steelhead Acquisition EE, Inc.'s*
*Motion for Partial Summary Judgment,*
**GRANTED, in part, and DENIED, in part.**

*Upon Plaintiff Jiggy Puzzles, LLC's*
*Motion for Partial Summary Judgment*
**GRANTED, in part, and DENIED, in part.**

## MEMORANDUM OPINION AND ORDER

Blake A. Bennett, Esquire, COOCH & TAYLOR P.A., Wilmington, Delaware; Kyle W. Roche, Esquire (*argued*), Velvel Freedman, Esquire, Riley Clafton, Esquire, and Mendel Konikov, Esquire, FREEDMAN NORMAND FRIEDLAND LLP, New York, New York, *Attorneys for Plaintiff/Counterclaim Defendant Jiggy Puzzles, LLC.*

Alexandra M. Cumings, Esquire, and Jialu Zou, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Blaine I. Green, Esquire (*argued*), and Jeremy F. Ruef, Esquire, PILLSBURY WINTHROP SHAW PITTMAN LLP, San Francisco, California, *Attorneys for Defendants/Counterclaim Plaintiffs Steelhead Acquisition EE, Inc and Aestuary, Inc*.

**WALLACE, J.**

Plaintiff Jiggy Puzzles, LLC ("Jiggy") entered into an Asset Purchase Agreement ("APA") with Defendant Steelhead Acquisition EE ("Steelhead"), which is owned by Aestuary, Inc. ("Aestuary" and collectively, "Defendants").[1] After Closing, Jiggy sued Steelhead for breach of contract and breach of the implied duty of good faith and fair dealing, and sued Aestuary for fraudulent inducement.[2] Aestuary responded with a counterclaim of fraud against Jiggy.[3] And Steelhead countered with counterclaims of breach of contract, fraud, and breach of the implied covenant of good faith and fair dealing against Jiggy.[4]

Now, the parties seek summary judgment. Specifically, Steelhead moves for summary judgment on Jiggy's breach-of-contract claim relating to the APA's earnout provision and Jiggy's implied-covenant claim, Aestuary moves for summary judgment on Jiggy's fraud claim, and Jiggy moves for summary judgment on Aestuary's fraud counterclaim, Steelhead's breach-of-contract counterclaim, Steelhead's implied-covenant counterclaim, and several of the Defendants' affirmative defenses.

---

[1] *See generally* Amend. Compl. (D.I. 58).

[2] *See id.*, 33–35.

[3] *See generally* Def. Aestuary, Inc.'s Answer, Affirmative Defenses, and Countercls. in Resp. to Amend. Compl. [hereinafter "Aestuary's Answer" or "Aestuary's Countercl."] (D.I. 87).

[4] *See generally* Def. Steelhead Acquisition EE Inc.'s Answer, Affirmative Defenses, and Countercls. in Resp. to Amend. Compl. [hereinafter "Steelhead's Answer" or "Steelhead's Countercl."] (D.I. 88).

For the foregoing reasons, Steelhead's Motion for Partial Summary Judgment is **GRANTED, in part, and DENIED, in part,** Aestuary's Motion for Partial Summary Judgment is **DENIED,** and Jiggy's Motion for Partial Summary Judgment is **GRANTED, in part, and DENIED, in part**.

## I. BACKGROUND

Unless otherwise noted, the Court draws the following background from undisputed facts in the pleadings and documentary exhibits submitted by the parties.

### A. THE PARTIES

Plaintiff Jiggy is a Delaware limited liability company.[5]

Defendants Steelhead and Aestuary are both Delaware corporations with their principal places of business in San Francisco, California; Steelhead is a wholly owned subsidiary of Aestuary.[6]

### B. THE APA

Kaylin Marcotte founded Jiggy in November 2019 as a niche puzzle brand that capitalized on the surge of stay-at-home hobbies during the COVID-19 pandemic.[7] After rapid growth during its first two years, the Jiggy business

---

[5]  Aestuary Countercl., at ¶ 2; Steelhead Countercl., at ¶ 2; Jiggy Puzzles, LLC's Answer to Aestuary Inc.'s Countercls. and Jiggy Puzzles, LLC's Answer to Def. Steelhead Acquisition EE Inc.'s Countercls., at ¶ 2 (D.I. 96, 97).

[6]  Amend. Compl., at ¶¶ 8-9; Aestuary Answer, at ¶¶ 8-9; Steelhead Answer, at ¶¶ 8-9.

[7]  Countercl. Pls.' Answering Br. in Opp'n to Jiggy's Mot. for Partial Summ. J. [hereinafter

leveled off and declined in 2022.[8] Because of this, Ms. Marcotte engaged DBD Partners ("DBD") to find a buyer and facilitate sale of the business.[9] DBD's outreach included contact with about 118 potential buyers.[10] Through this effort, Jiggy obtained a letter of intent ("LOI") from Aestuary.[11] After signing the LOI, Aestuary formed Steelhead to acquire and hold Jiggy's assets.[12]

In April 2023, Aestuary operations associate David Herrera sent Ms. Marcotte an email expressing interest in a potential acquisition.[13] The parties conducted due diligence leading up to the acquisition.[14] Then, Ms. Marcotte presented Jiggy to Aestuary co-founders and executives Adam Brzeczek and Juan Castellanos.[15]

---

"Defs.' Opp'n."], at 5 (D.I. 106) (citing Amend. Compl., at ¶ 14); Aff. of Blaine I. Green in Supp. of Steelhead's Op. Br. in Supp. of its Mot. for Summ. J. [hereinafter "Green Aff."], Ex. A [hereinafter "Marcotte 10/14 Tr."], at 13 (D.I. 90).

[8] Marcotte 10/14 Tr., at 150; Green Aff., Ex. C [hereinafter "Marcotte 10/21 Tr."], at 231 (D.I. 90).

[9] Marcotte 10/14 Tr., at 196–197.

[10] Transmittal Aff. of Alexandra M. Cumings in Supp. of Countercl. Pls.' Answering Br. in Opp'n to Jiggy's Mot. for Partial Summ. J. [hereinafter "Cumings Opp'n Aff."], Ex. 5 (D.I. 106).

[11] Green Aff., Ex. B [hereinafter "Marcotte 10/16 Tr."], at 14 (D.I. 90); Cumings Opp'n Aff., Ex. 6 (D.I. 106).

[12] Defs.' Opp'n, 8; Pl. Jiggy Puzzles, LLC's Op. Br. in Supp. of its Partial Mot. for Summ. J. [hereinafter "Jiggy Op. Br."], at 1 (D.I. 93).

[13] Amend. Compl., at ¶ 24; Aestuary Answer, at ¶ 24; Steelhead Answer, at ¶ 24.

[14] Amend. Compl., at ¶ 28; Aestuary Answer, at ¶ 28; Steelhead Answer, at ¶ 28.

[15] Marcotte 10/14 Tr., at 228.

During negotiations, Aestuary represented to Jiggy that:

(1) Aestuary had significant cash reserves on hand;

(2) Aestuary's equity investors had committed sufficient capital to grow its portfolio companies, including Jiggy;

(3) Aestuary had the financial and human resources to expand Jiggy's operations; and

(4) Aestuary intended to deploy its marketing, supply chain, and operations expertise to virtually guarantee it would grow Jiggy's revenue by at least ten percent.[16]

In the lead-up to signing the APA, Jiggy presented profit-and-loss statements and financial information from DBD and an outsourced accountant, Empire Tax.[17] After Aestuary identified inconsistencies in Jiggy's reported financials, the parties agreed to reduce the purchase price.[18]

## C. APA MATERIAL PROVISIONS

Jiggy and Steelhead executed the APA on August 17, 2023.[19] The APA is a valid and enforceable contract supported by adequate consideration.[20]

---

[16] Aestuary's Op. Br. in Supp. of its Mot. for Summ. J. [hereinafter "Aestuary Op. Br."], at 1 (D.I. 89) (citing Amend. Compl., at ¶¶ 2, 31, 128); Decl. of Kaylin Marcotte in Supp. of Jiggy Puzzles LLC's Opp'ns to Defs.' Motions for Summ. J. [hereinafter "Marcotte 12/8 Decl."], at ¶¶ 5–6 (D.I. 105); Marcotte Tr. 10/14, at 56–57.

[17] Decl. of Kaylin Marcotte in Supp. of Jiggy Puzzles LLC's Motion for Summ. J. [hereinafter "Marcotte 11/7 Decl."], at ¶¶ 5–8 (D.I. 93).

[18] Cumings Opp'n Aff., Ex. 13.

[19] Defs.' Opp'n, at 9 (citing Amend. Compl., at ¶ 1); *See* Transmittal Aff. of Blake A. Bennett [hereinafter "Bennett Op. Aff."], Ex. 32 [hereinafter "APA"] (D.I. 93); Marcotte 10/14 Tr., at 14.

[20] Amend. Compl., at ¶ 113; Aestuary Answer, at ¶ 113; Steelhead Answer, at ¶ 113.

Steelhead paid Jiggy a purchase price of $825,000 at closing for substantially all of Jiggy's assets.[21] Several APA provisions and warranties form the basis of the claims:

- Section 2.1(d) required Jiggy to transfer to Steelhead all technology and related materials as outlined in that section.[22]

- Section 2.3 provides that Steelhead doesn't assume any of Jiggy's pre-closing liabilities except for the list of "Excluded Categories," which includes "expenses . . . arising under Contract" and, under subdivision (j), "[a]ny Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions."[23]

- Section 4.19 warrants that Jiggy's financial statements fairly present its financial position in accordance with generally accepted accounting principles ("GAAP").[24]

- Section 4.20 warrants that Jiggy "has been conducted in the ordinary course consistent with past practices" and that no event or development had occurred that could reasonably be expected to have a material adverse effect.[25]

- Section 4.21 warrants that Jiggy has no liabilities, except those reflected in the balance sheet or incurred in the ordinary course since the balance-sheet date.[26]

---

[21] Defs.' Opp'n, 9 (citing Amend. Compl., at ¶ 4); *See generally* APA.

[22] APA § 2.1(d).

[23] *Id.* § 2.3.

[24] *Id.* § 4.19.

[25] *Id.* § 4.20.

[26] *Id.* § 4.21.

- Section 7.2 mandates that Jiggy keep the APA and its terms confidential and prohibits public disclosure without consent.[27]

- Finally, the APA has an earnout provision.[28] Under Section 2.9(a) of the APA, Jiggy was eligible to receive up to three Stability Payments in the first year post-closing if revenue met specified thresholds: (1) $100,000 if revenue exceeded $978,091.96 for the first four months post-closing; (2) $100,000 if revenue exceeded $575,000.41 over the next four months postclosing; and (3) $100,000 if revenue exceeded $1,870,780.59 over the 12 months post-closing.[29] The APA requires the Purchaser to determine revenue attributable to the Business in good faith.[30]

## D. POST-CLOSING ISSUES

Within a month after closing, Megan Petit, Jiggy's Head of Operations, resigned.[31] Ms. Marcotte recommended several marketing and product initiatives for Jiggy that would result in negative margins or would necessitate degrading product quality.[32]

Also, after closing, the Defendants made several decisions that reduced

---

[27] *Id.* § 7.2.

[28] *See id.* § 2.9.

[29] *Id.*

[30] *See id.* §§ 2.9(a)(i)–(iii), 2.9(b)(i)–(iv).

[31] Aff. of Adam Brzeczek in Supp. of Steelhead's Mot. for Partial Summ. J. [hereinafter "Brzeczek Aff."], at ¶¶ 22–23 (D.I. 90); *See* Steelhead's Op. Br. in Supp. of Mot. for Partial Summ. J. [hereinafter "Steelhead's Op. Br."], at 6 (D.I. 90).

[32] Brzeczek Aff., at ¶¶ 28–32.

Jiggy's revenue regarding the earnout payment calculation.[33] Steelhead cut nearly all Jiggy marketing spend, despite it being the peak holiday shopping season and one of Jiggy's most profitable periods.[34] Steelhead also deprioritized Jiggy's Amazon channel and destroyed thousands of Jiggy units across multiple SKUs without informing Ms. Marcotte.[35] Lastly, Steelhead rejected large brand-building opportunities that Jiggy had already secured, refused to sell certain new products, and missed large purchase order deadlines.[36] In the first two years post-acquisition, Jiggy did not meet the thresholds required for Stability and Earnout Payments.[37]

In August 2024, in connection with revenue reviews and calculations due for the first-year earnout after the first post-closing year, the Defendants discovered double-counted revenue in Jiggy's financials.[38]

---

[33] Marcotte 12/8 Decl., at ¶¶ 14–17; *See* Pl.'s Opp'n to Steelhead's Mot. for Partial Summ. J. [hereinafter "Jiggy Opp'n to Steelhead"], at 18–30 (D.I. 105).

[34] Marcotte 10/16 Tr., at 120; Transmittal Aff. Of Blake A. Bennett in Supp. of Pl.'s Opp'n to Aestuary's Mot. for Summ. J. [hereainafter "Bennett Opp'n Aff."], Ex. 10 [hereinafter "Aestuary Earnout Messages"], at SAEE_01311781 (D.I. 104); Marcotte 12/8 Decl., at ¶ 15.

[35] Bennett Opp'n Aff., Ex. 15 [hereinafter "Marcotte Amazon Email"], at SAEE_01091903 (D.I. 104); Bennett Opp'n Aff., Ex. 14 [hereinafter "Inventory Email"], at SAEE_01090372–73 (D.I. 104); Green Aff., Ex. D [hereinafter "Brzeczek Tr."], at 260 (D.I. 90).

[36] Marcotte 12/8 Decl., at ¶ 16.

[37] *See* Brzeczek Aff., Exs. 2–5 (emails and calculations demonstrating that Jiggy did not meet the earnout threshold) (D.I. 90); *see also* Brzeczek Aff., at ¶¶ 3–6.

[38] Brzeczek Tr., at 163–164, 175; *see* Green Aff., Ex. H [hereinafter "Steelhead Resp."] No. 3 (D.I. 90).

## II. PARTIES' CONTENTIONS

Steelhead moves for summary judgment on Jiggy's claim that Steelhead breached the earnout provision and Jiggy's implied-covenant claim that Steelhead acted in bad faith to lower Jiggy's revenues and avoid an earnout.[39] Steelhead contends that: (1) there is no contract breach since there is no efforts clause; (2) the implied-covenant claim is improperly duplicative; (3) the implied covenant is inapplicable; and (4) there is no evidence of bad faith.[40] Jiggy replies that: (1) Steelhead breached the good-faith calculation clause; (2) the implied-covenant claim isn't duplicative; (3) the implied covenant applies when a party is given discretion in a contract; and (4) there is ample evidence of bad faith.[41]

Aestuary moves for summary judgment on Jiggy's claim that Aestuary fraudulently induced it to sign the APA.[42] Aestuary claims that: (1) there was no misrepresentation; (2) there was no reliance; and (3) the fraud claim's damages are identical to the contract damages.[43] Jiggy counters that: (1) there were misrepresentations; (2) Jiggy justifiably relied on these representations; and (3) the fraud is separate and distinct from the contract claim and seeks different

---

[39] *See generally* Steelhead's Op. Br.

[40] *See generally id.* at 8–35.

[41] *See generally* Jiggy Opp'n to Steelhead, at 5–30.

[42] *See generally* Aestuary Op. Br.

[43] *See generally id.* at 9–24.

damages.[44]

Finally, Jiggy moves for summary judgment on the Defendants' fraud counterclaim, Steelhead's breach-of-contract counterclaim, Steelhead's implied-covenant counterclaim, and several of the Defendants' Affirmative Defenses.[45] Jiggy's main contentions are that: (1) no evidence supports the elements of fraud; (2) there are no breaches or damages to support Steelhead's contract counterclaim; (3) a separate contract governs Steelhead's implied-covenant claim and is impermissibly based on pre-contract conduct; and (4) the affirmative defenses aren't actual affirmative defenses.[46] The Defendants respond that: (1) there is evidence of fraud in the form of overstated revenue in financial statements and the claim is otherwise genuinely disputed; (2) Steelhead experienced specific damages from the breaches; (3) the separate contract doesn't bar Steelhead's implied-covenant claim which is based on post-closing conduct; and (4) the challenged affirmative defenses are valid.[47]

## III. STANDARD OF REVIEW

This Court can grant a moving party's motion for summary judgment under Delaware Superior Court Rule 56 only when no genuine issue of material

---

[44] *See generally* Jiggy Opp'n to Aestuary, at 15–16.

[45] *See generally* Jiggy Op. Br.

[46] *See generally id.* at 5–26.

[47] *See generally* Defs.' Opp'n, 15–35.

fact exists, and the party is entitled to judgment as a matter of law.[48] Summary judgment "will not be granted if there is a material fact in dispute"[49] or if "it seems desirable to inquire thoroughly into [the facts] to clarify the application of the law to the circumstances."[50] The moving party has the burden of demonstrating "its claim is supported by undisputed facts."[51] If the moving party meets its burden, the burden shifts to the non-moving party to show there is a "genuine issue for trial."[52] In determining whether such a genuine issue exists, "the Court must view the facts in the light most favorable to that non-moving party."[53] "Lastly, the Court accepts as true the parties' factual stipulations."[54]

"While the Court may not be able to grant summary judgment 'if the factual record has not been developed thoroughly enough to allow the Court to

---

[48]  Del. Super. Ct. Civ. R. 56; *Options Clearing Corp. v. U.S. Specialty Ins. Co.*, 2021 WL 5577251, at *7 (Del. Super. Ct. Nov. 30, 2021); *Motors Liquid. Co. DIP Lenders Tr. v. Allianz Ins. Co.*, 2017 WL 2495417, at *5 (Del. Super. Ct. June 19, 2017).

[49]  *Radulski v. Liberty Mut. Fire Ins. Co.*, 2020 WL 8676027, at *3 (Del. Super. Ct. Oct. 28, 2020); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[50]  *Ebersole v. Lowengrub*, 180 A.2d 467, 468–69 (Del. 1962).

[51]  *Radulski*, 2020 WL 8676027, at *3 (citing *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979)).

[52]  Del. Super. Ct. Civ. R. 56(e); *CNH Indus. Am. LLC v. Am. Casualty Co. of Reading*, 2015 WL 3863225, at *1 (Del. Super. Ct. June 8, 2015) ("If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder.").

[53]  *Radulski*, 2020 WL 8676027, at *3 (citing *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977)).

[54]  *Id.*

apply the law to the factual record,'"[55] "a matter should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary."[56] "[W]hen an ultimate fact to be determined is one of motive, intention or other subjective matter, summary judgment is ordinarily inappropriate."[57] Without doubt, summary judgment is encouraged, but there is no "right" to summary judgment.[58]

## IV. DISCUSSION

The Court first addresses whether Jiggy's claims survive summary judgment, and concludes that: (1) Jiggy's earnout provision breach-of-contract claim fails since there is no reasonable efforts clause in the APA's earnout provision; (2) Jiggy's breach-of-the-implied-covenant claim survives since there is evidence of potential bad faith; and (3) Jiggy's fraudulent inducement claim partially withstands summary judgment because some of the alleged misrepresentations are supported by evidence of pre-Closing fraudulent conduct.

Next, the Court considers the Defendants' fraud counterclaims and holds

---

[55]   *Id.* at *4 (quoting *CNH Indus. Am.*, 2015 WL 3863225, at *1).

[56]   *Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999); *Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. Aug. 23, 1996).

[57]   *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 2021 WL 4344172, at *21 (Del. Super. Ct. Sept. 23, 2021) (quoting *LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2019 WL 7369198, at *22 (Del. Ch. Dec. 31, 2019)).

[58]   *US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1034 (Del. Super. Ct. 2023) (quoting *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002) (internal quotation marks and citation omitted)).

that only Aestuary's fraud counterclaim makes it past summary judgment as Steelhead's fraud counterclaim is impermissibly bootstrapped to its breach-of-contract counterclaim.

Then, the Court turns to Steelhead's breach-of-contract and breach-of-the-implied-covenant counterclaims and determines that: (1) Steelhead's breach-of-contract counterclaim is supported by record evidence; but (2) certain aspects of Steelhead's breach-of-the-implied covenant counterclaim fail because they are largely based on post-Closing conduct expressly covered by the APA.

Finally, the Court addresses Jiggy's challenges to the Defendants' Affirmative Defenses, one of which it has jurisdiction over, others of which aren't "affirmative defenses" to be labeled as such before the jury, and the remainder of which are proper affirmative defenses that may be pressed at trial.

## A. JIGGY'S CONTINGENT-PAYMENT BREACH-OF-CONTRACT CLAIM AGAINST STEELHEAD FAILS.[59]

To prevail on a breach-of-contract claim, one must show: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages.[60]  A court

---

[59]   Jiggy highlights that there are other alleged breaches against Steelhead in its opposing brief.  Jiggy Opp'n to Steelhead, 5–7.  Steelhead only moves for summary judgment on the earnout provision breach and not the other alleged breaches.  *See* Reply Br. in Supp. of Steelhead's Mot. for Partial Summ. J. [hereinafter "Steelhead's Reply Br."], at 7 (D.I. 120) ("Steelhead Did Not Breach The Provisions Of The APA Relating To Contingent Payments."). So only the breach claim relating to the Earnout Provision is dismissed, not the breach-of-contract claim against Steelhead in its entirety.

[60]   *See VLIW Tech., LLC v. Hewlett-Packard, Co.*, 840 A.2d 606, 612 (Del. 2003).

generally gives priority to the parties' intentions contained in the four corners of the contract.[61] "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[62] "The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[63] "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[64] "When construing a contract, and unless a contrary intent appears, [courts] will give words their ordinary meaning."[65]

Where the contract's language is plain and unambiguous, it must be enforced as written.[66] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[67]

---

[61]   *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).

[62]   *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del. 1985).

[63]   *Riverbend Community, LLC v. Green Stone Engr., LLC*, 55 A.3d 330, 334 (Del. 2012) (citation omitted).

[64]   *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 256 (Del. 2017), *as revised* (Mar. 28, 2017) (quoting *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005)).

[65]   *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 824 (Del. 1992).

[66]   *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).

[67]   *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

## 1. There is no efforts clause for Steelhead to breach.

Steelhead insists that Jiggy cannot succeed on its breach-of-contract claim as the APA's Revenue Thresholds weren't met, and the APA doesn't dictate how Steelhead had to operate Jiggy.[68] Jiggy responds that the APA's Good Faith Calculation provision supports its claim.[69]

The APA doesn't contain a provision dictating that Steelhead engage any particular efforts in *operating* Jiggy—indeed, it appears the parties left that to the new owners' discretion. Now, APA Section 2.9(a)(i) says that Revenue attributable to Jiggy is to be "determined by Purchaser in good faith."[70] But this says nothing as to how Jiggy had to be run. And that language doesn't, in any way, govern Steelhead's business decisions that might lower Jiggy's post-sale revenue. Rather, it applies only to the actual calculation of Revenue to be attributed to Jiggy and what had to be included in that calculation. Jiggy's theory of breach is entirely based on decisions before the revenue calculation that lowered revenue attributable to Jiggy, not the actual revenue calculation to see if Jiggy's revenue met the threshold.[71] Indeed, Section 2.10 provides the route the

---

[68]  Steelhead's Op. Br., at 8–18.

[69]  Jiggy Opp'n to Steelhead, at 7–10.

[70]  APA § 2.9(a)(i).

[71]  *See* Jiggy Opp'n to Steelhead, at 7–10.

parties are to take if they dispute a revenue calculation.[72]  As a result, Steelhead's

motion for summary judgment is **GRANTED** on Jiggy's breach-of-contract

claim relating to the revenue calculation since Jiggy doesn't challenge the actual

calculation, any calculation dispute had to be sent to the Independent Accountant

via APA 2.10,[73] and there is no reasonable efforts clause in the APA for Steelhead

to breach.

## B. JIGGY'S IMPLIED-COVENANT CLAIM AGAINST STEELHEAD SURVIVES.

Every contract contains an implied covenant of good faith and fair dealing.

The implied covenant requires "'a party in a contractual relationship to refrain

from arbitrary or unreasonable conduct which has the effect of preventing the

other party to the contract from receiving the fruits' of the bargain."[74]  "Beyond

its gap filling function, the implied covenant applies 'when a party to the contract

is given discretion to act as to a certain subject and it is argued that the discretion

has been used in a way that is impliedly proscribed by the contract's express

terms.'"[75] "Although contracts often grant wide—if not unfettered—discretion to

---

[72]  *See* APA § 2.10.

[73]  *See id.* § 2.10(b).

[74]  *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985)).

[75]  *SerVaas v. Ford Smart Mobility LLC*, 2021 WL 3779559, at *10 (Del. Ch. Aug. 25, 2021) (quoting *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 504 n.93 (Del. 2019)).

one party, 'the law presumes that parties never accept the risk that their counterparties will exercise their contractual discretion in bad faith.'"[76]

Courts will not infer that an obligation exists, that "contradicts a clear exercise of an express contractual right."[77] Express contractual language is more persuasive than a party's actions implementing a contract.[78] Courts will infer an obligation "when the express terms of the contract indicate that the parties would have agreed to the obligation had they negotiated the issue, [so] the plaintiff must advance provisions of the agreement that support this finding in order to allege sufficiently a specific implied contractual obligation."[79]

Our Supreme Court has warned that the implied covenant of good faith and fair dealing:

> Involves a cautious enterprise, inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated. One generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement. We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.[80]

---

[76] *Id.*

[77] *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).

[78] *Id.* at 1126.

[79] *Cantor Fitzgerald, L.P. v. Cantor, et al.*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998) (footnote omitted).

[80] *Nemec*, 991 A.2d at 1125–26 (internal citations and quotations omitted).

The covenant will not allow mere "post contractual rebalancing of the economic benefits flowing to the contracting parties."[81]  Rather, the covenant applies "only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer.  In the Venn diagram of contract cases, the area of overlap is quite small."[82]

**1. There is evidence allowing a reasonable juror to find that Steelhead acted in bad faith when operating Jiggy.**

Steelhead maintains that the implied covenant is inapplicable as there is no contractual gap in the APA to fill.[83]  But as just mentioned, the implied covenant applies even when a party to a contract is granted unfettered discretion.  Here, there is no reasonable efforts clause applying to how Steelhead was to operate Jiggy after closing.  So Steelhead had no limitations and sole discretion to operate Jiggy as it saw fit.  That said, Steelhead still might have breached the implied covenant if it acted in bad faith to ensure that Jiggy wouldn't qualify for an earnout payment.[84]

[81]  *Id*. at 1127–28.

[82]  *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

[83]  Steelhead's Reply Br., at 14.

[84]  *See Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 460 (Del. Ch. 2023) (recognizing that the implied covenant requires a party with contractual discretion to act in good faith and even contract terms that might enhance the level of discretion don't necessarily eliminate the implied covenant).

Jiggy has developed record evidence of bad faith. About four months after closing, Steelhead's senior leadership was communicating that they planned to make "game time decisions if the [contingency] triggers are too close."[85] In those same messages, Steelhead executive Juan Castellanos predicted—based on Steelhead's own internal plan—that Jiggy would miss the earnouts.[86] Right after this exchange, Steelhead cut nearly all Jiggy marketing spend, despite it being the peak holiday shopping season and one of Jiggy's most profitable periods.[87] Steelhead also deprioritized Jiggy's Amazon channel and destroyed thousands of Jiggy units across multiple SKUs without informing Ms. Marcotte.[88] Lastly, Steelhead rejected large brand-building opportunities that Jiggy had already secured, refused to sell certain new products, and missed large purchase order deadlines.[89]

On this evidence, a juror could reasonably find that Steelhead concocted an internal plan to lower Jiggy's revenues to eschew paying an earnout payment and then followed through with that plan. A juror could interpret the messages to mean that Steelhead had already decided that Jiggy wasn't going to get the

---

[85] Aestuary Earnout Messages, at SAEE_01311779.

[86] *Id.*

[87] Marcotte 10/16 Tr., at 120; Aestuary Earnout Messages, at SAEE_01311781.

[88] Marcotte Amazon Email, at SAEE_01091903; Inventory Email, at SAEE_01090372–73; Brzeczek Tr., at 260.

[89] Marcotte 12/8 Decl., at ¶ 16.

earnout due to the plan to cut Jiggy's revenues and avoid an earnout payment. True, it's not an automatic breach of the implied covenant for Steelhead to make decisions that diminish Jiggy's profits. This is so even if these decisions significantly hindered Jiggy's profits, provided they were not done in bad faith with the intent to evade an earnout payment. But at the summary judgment stage, it is not the Court's place to weigh evidence and see if Steelhead has something more compelling to support its assertion that it was just making reasonable business decisions unmotivated by bad faith. Therefore, Steelhead's motion for summary judgment on Jiggy's implied-covenant claim is **DENIED**.

## C. JIGGY'S FRAUDULENT INDUCEMENT CLAIM SURVIVES.

Fraud consists of the following elements:

> (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[90]

There is no elemental difference between fraud and fraud in the inducement.[91]

Aestuary moves for summary judgment on Jiggy's fraudulent inducement

---

[90] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983) (cleaned up).

[91] *Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 463 n.34 (Del. Ch. 2024).

claim.[92]

## 1. The statements Jiggy complains of are not solely supported by post-closing actions and may be misrepresentations that can support a fraudulent inducement claim.

Aestuary first attacks the fraudulent inducement claim by arguing that there was no misrepresentation to support the first element of fraud.[93] Again, the statements are that: (a) Aestuary had significant cash reserves on hand; (b) Aestuary's equity investors had committed sufficient capital to grow its portfolio companies, including Jiggy; (c) Aestuary had the financial and human resources to expand Jiggy's operations; and (d) Aestuary intended to deploy its marketing, supply chain, and operations expertise to virtually guarantee it would grow Jiggy's revenue by at least ten percent.[94]

As for the first three statements, Aestuary submits that they are vague, subjective, and true.[95] But a statement that overstates a party's present wealth can constitute a misrepresentation.[96] And Jiggy points to evidence of Aestuary's

---

[92] *See generally* Aestuary Op. Br.

[93] Aestuary Op. Br., at 9–16.

[94] Aestuary's Op. Br., at 1 (citing Amend. Compl., ¶¶ 2, 31, 128); Marcotte 12/8 Decl., at ¶¶ 5–6; Marcotte 10/14 Tr., at 56–57; Marcotte 10/16 Tr., at 55–56; Brzeczek Tr., at 136–141.

[95] Aestuary Op. Br., at 10–12.

[96] *See Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *16 (Del. Ch. Sept. 10, 2018) (holding that statements that give the impression of considerable wealth is a misrepresentation).

significant pre-closing cash flow problems.[97]   There is also evidence that Aestuary knew pre-closing that it would not have the human resources to grow Jiggy after the deal went through.[98]  The statement of having sufficient cash on hand could give a false impression as to the true state of affairs.[99]  What's more, whether Aestuary did or did not have significant cash on hand is genuinely disputed by the parties.[100]   These first three statements can be deemed misrepresentations—supported by contemporaneous facts of knowledge of falsity—that can buttress a fraudulent inducement claim.

The fourth statement is a much closer call.  Aestuary represented that it could and would deploy its resources to virtually guarantee the earnout payment. No doubt, optimistic statements praising skills, experience, and resources are

---

[97]   Bennett Opp'n Aff., Ex. 6, at SAEE_01077813 ("The emergency cashflow management process worked . . . it got everyone on the same page about how we needed to manage cash and extended runway long enough to get the Jiggy money through the door.") (D.I. 104); *id.*, Ex. 7, at SAEE_01077734 ("[Ms. Marcotte] may be thinking she should just hold onto the business or [something]" . . . "Yeah but we can't let her think that otherwise we're fucked haha"); *id.*, Ex. 9, at SAEE_01077781 ("we got [the] LOI signed for Jiggy Puzzles and were able to draw more than we needed for the deal, so we will be able to survive this year").

[98]   *Id.*, Ex. 9, at SAEE_01077781 (Pre-closing messages showing that Aestuary knew it was "going through an exercise to make cuts and go bare bones to try and maintain revenue," an exercise that "has growth implications" and included measures for "reducing costs" and "running [the] team lean.").  It can be inferred from these messages that Aestuary then knew it was going to significantly cut its staff pre-closing and would not have the human capital needed to grow Jiggy.

[99]   *See Norton v. Poplos*, 443 A.2d 1, 5 (Del. 1982) ("a statement or assertion . . . may constitute an actionable misrepresentation if it causes a false impression as to the true state of affairs.").

[100]  *Compare* Aestuary Op. Br., at 10–12 *with* Jiggy Opp'n to Aestuary, at 14–17.

mere puffery that cannot form the basis of a fraud claim.[101] And fraudulent inducement generally requires a misrepresentation of present facts rather than a statement of future intent.[102] But one might state a claim "by showing that the defendant had an actual present intent not to perform [] its promises."[103] Here, Jiggy cites evidence it suggests shows Aestuary had no intention to use its resources to obtain the revenue needed for an earnout payment.[104] But this evidence is all post-closing.[105] Delaware courts generally require something more than post-closing non-performance to justify an inference of wrongful intent to support a claim of fraud.[106]

---

[101] *Trifecta Multimedia Hldgs.*, 318 A.3d at 463 (citing *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *3 (Del. Ch. Oct. 19, 2004)).

[102] *Cercacor Labs., Inc. v. Metronom Health, Inc.*, 2025 WL 1180186, at *9 (Del. Super. Ct. Apr. 23, 2025).

[103] *Id.* at *9 (quoting *CRE Niagara Holdings, LLC v. Resort Grp., Inc.*, 2022 WL 1749181, at *14 (Del. Super. Ct. May 31, 2022)).

[104] *See* Jiggy Opp'n to Aestuary, at 21–22 (citing to post-closing evidence of Aestuary predicting that the revenue amount to trigger an earnout wouldn't be met and making several decisions that lowered revenue).

[105] Aestuary internally predicted after closing that Jiggy would not hit the earnout for 2024, 2026, or 2027—and was willing to make "game time decisions as needed if the triggers are too close." Aestuary Earnout Messages, at SAEE_01311779; After closing, Aestuary cut nearly all paid marketing during the fourth quarter—Jiggy's most consequential growth period— causing a 21% decline in year-over-year revenue. Aestuary Earnout Messages, at SAEE_01311780–81; Marcotte 12/8 Decl., at ¶ 15; Also, after closing, Aestuary destroyed much of the inventory relevant to the Inventory Payments without telling Ms. Marcotte. Inventory Email, at SAEE_01090372–74; Brzeczek Tr., at 260.

[106] *Murphy v. Godwin*, 303 A.2d 668, 673 (Del. Super. Ct. 1973); *see also Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *16 (Del. Ch. Nov. 19, 2013) ("A claim improperly based on hindsight attempts to infer fraudulent intent based solely on subsequent activity."); *In re Encore Computer Corp. S'holders Litig.,* 2000 WL 823373, at *8–9 (Del. Ch. June 16, 2000) (declining to infer pre-closing intent based solely on post-closing actions;

That said, the Court of Chancery recently allowed a fraud claim that was based on post-transaction actions to survive the motion-to-dismiss stage.[107] And while this is the summary-judgment stage, and the Defendant's suggest Jiggy's only evidence to support the scienter behind the "virtual guarantee" statement is exclusively post-closing, this is not the "classic 'fraud by hindsight'" with "an absence of any contemporaneous facts permitting an inference of falsity or bad faith."[108] Rather, when placed in context of that just outlined, the "virtual guarantee" statement, too, is properly supported by evidence of then-existing falsity and intent.[109]

### 2. The integration clause doesn't bar reliance, and justifiable reliance is a question for trial.

Aestuary next contends that the APA's reliance clause bars any justifiable reliance by Ms. Marcotte.[110] Delaware law requires specific and unambiguous

---

*Sanders v. Devine,* 1997 WL 599539, at *9 (Del. Ch. Sept. 24, 1997) (declining to infer fraudulent intent as of the date shares were issued solely because those shares later were cashed out by the issuer).

[107] *Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 465 (Del. Ch. 2024).

[108] *Mooney v. E. I. du Pont de Nemours & Co.*, 2017 WL 5713308, at *6 (Del. Super. Ct. Nov. 28, 2017), *aff'd,* 192 A.3d 557 (Del. 2018); *see also Noerr v. Greenwood,* 1997 WL 419633, at *4–5 (Del. Ch. July 16, 1997) (discussing federal and state authority and rejecting "'fraud by hindsight'" allegations).

[109] *Cf. Stein v. Wind Energy Holdings, Inc.*, 2022 WL 17590862, at *7 (Del. Super. Ct. Dec. 13, 2022) ("A party cannot plead an intent to defraud using subsequent reversals *absent* contemporaneous facts supporting a reasonable inference that the defendant knew the future reversal would happen.") (emphasis added).

[110] Aestuary Op. Br., at 17–18.

anti-reliance language to preclude a fraudulent inducement claim premised on defendant's pre-contract statements, since the plaintiff can't plead justifiable reliance on extracontractual statements when they promised not to rely on them.[111]  But an integration clause without anti-reliance language doesn't do the same.[112]

Here, the APA's integration clause provides that it "constitute[s] the entire agreement between the Parties . . . and supersede[s] all prior agreements and understandings both written and oral, between the Parties with respect to the subject matter hereof."[113]  This is a standard integration clause without specific anti-reliance language, and it doesn't bar claims of justifiable reliance.  In fact, the APA's integration clause is almost identical to the integration clause in *Park7 Student Housing, LLC v. PR III/Park7 SH Holdings, LLC*, where the Court of Chancery held that this language lacked an antireliance provision that bars fraud claims.[114]

Moreover, questions of knowledge or intent are fact-intensive, and courts

---

[111] *Park7 Student Hous., LLC v. PR III/Park7 SH Holdings, LLC*, 340 A.3d 614, 618 (Del. Ch. 2025).

[112] *Id.*

[113] APA § 10.4.

[114] *See Park7*, 340 A.3d at 617 n.10 ("This Agreement supersedes all prior agreements between the Parties with respect to the subject hereof and all discussions, understandings, offers, and negotiations with respect thereto, whether oral or written.").

- 24 -

ordinarily shouldn't resolve these questions on summary judgment.[115]  Aestuary posits that Ms. Marcotte didn't justifiably rely on anything because she relied on DBD and was a sophisticated party that could have asked questions to verify Aestuary's representations.[116]  Jiggy cites evidence that Ms. Marcotte relied on Aestuary's representations, not DBD's.[117]  Indeed, Aestuary may have a strong case that there was no justifiable reliance.  But the reasonableness of a party's reliance is generally a question of fact that cannot be determined on summary judgment.[118]  Accordingly, the issue of justifiable reliance is a question for the jury at trial.

### 3. Jiggy's fraud claim isn't bootstrapped and seeks damages different than its breach-of-contract claim.

Lastly, Aestuary attacks Jiggy's fraud claim with the bootstrap doctrine, averring that the facts are the same and the damages sought are identical.[119]

When distinguishing fraud from breach-of-contract claims, the Court generally looks to the timing of the alleged misconduct to determine whether the

---

[115] *Columbus Life Ins., Co. v. Wilmington Tr. Co.*, 2023 WL 1956868, at *8 (Del. Super. Ct. Feb. 13, 2023).

[116] Aestuary Op. Br., 18–20.

[117] Marcotte 10/14 Tr. 253: 2–12 (the virtual guarantee made Ms. Marcotte "much more comfortable with the terms of the deal" and "changed the posture of negotiating").

[118] *Columbus Life*, 2023 WL 1956868, at *11.

[119] Aestuary Op. Br., at 20–23.

inducement to deal is "separate and distinct" from the inducement to perform.[120]

In fact, Aestuary's brief does a good job of delineating these claims. Jiggy's remaining fraud allegation is that Aestuary made several false representations that induced Jiggy to enter into the APA.[121] While its contract claim, against Steelhead only, is that "Steelhead breached the APA in several ways, including . . . failing to take actions, designed to and with the intent of decreasing or avoiding payment of the Contingent Payments."[122] The Aestuary claim involves the inducement to deal, while the Steelhead claim is the actual post-closing breaches of the contract to which it is a party. Aestuary isn't a party to the APA. Thus, the facts underlying these claims differ, and there is no bootstrapping.

The fraud claim also seeks different damages. The fraud damages reflect the value Jiggy was actually worth at the time of the sale based on what it was promised, whereas the contract damages arise from the APA's Contingent Payments and distinct breaches after closing.[123] As such, there is no bootstrap

---

[120] *Surf's Up Legacy Partners*, *LLC v. Virgin Fest*, *LLC*, 2021 WL 117036, at *16 (Del. Super. Ct. Jan. 13, 2021) (quoting *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *5 (Del. Super. Ct. Mar. 13, 2017)).

[121] Amend. Compl., at ¶¶ 128–130.

[122] Aestuary Op. Br., at 21 (quoting Amend. Compl., at ¶ 115).

[123] *Compare* Amend. Compl., at ¶ 111 ("Defendants successfully defrauded JIGGY to acquire the company for a fraction of what it was worth to obtain financing, then dismantled it in bad faith to minimize the success of Steelhead and JIGGY, and any payments, under the APA.") *with* Amend. Compl., at ¶¶ 53–59 (alleging breach by Steelhead for failing to deliver Closing Inventory Statement after closing date and failing to pay Inventory Payments).

- 26 -

issue with Jiggy's fraud claim.[124]  And Aestuary only seeks summary judgment on the fraud claim.[125]  So Aestuary's Motion for Summary Judgment is **DENIED**.

**D. WHILE THERE ARE GENUINELY DISPUTED MATERIAL FACTS REGARDING STEELHEAD'S FRAUD COUNTERCLAIM, IT SEEKS DAMAGES IDENTICAL TO THE BREACH-OF-CONTRACT COUNTERCLAIM.**

In addition to overt misrepresentations, "fraud also may occur through deliberate concealment of material facts, or by silence in the face of a duty to speak."[126]

**1. The Court cannot now decide whether Ms. Marcotte knew or was recklessly indifferent to whether the financial statements were inaccurate.**

Jiggy argues that the second fraud element isn't satisfied since Ms. Marcotte relied on third-party advisors to create the at-issue financial reports.[127] So, says Jiggy, Ms. Marcotte couldn't have known if the financial statements were inaccurate.[128]

Again, questions of knowledge or intent are fact-intensive, and courts ordinarily shouldn't resolve these questions on a motion for summary

---

[124]  Aestuary also says that the economic loss doctrine applies. Aestuary Op. Br., 23–24.  But the doctrine doesn't prohibit recovery if the fraud allegations go directly to the inducement of the contract and not the performance. *Abbott Labs. v. Owens*, 2014 WL 8407613, at *7 (Del. Super. Ct. Sept. 15, 2014).

[125]  *See generally* Aestuary Op. Br.

[126]  *See Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 773–74 (Del. Ch. 2014).

[127]  Jiggy Op. Br., at 7.

[128]  *Id.*

judgment.[129]  And there is evidence that Ms. Marcotte directly participated in and helped prepare the revenue figures.[130]  The Defendants highlight that Ms. Marcotte reviewed and revised the spreadsheets.[131]  Too, Ms. Marcotte provided the financial books and records that DBD used to create the reports.[132]  Jiggy's contention that Ms. Marcotte couldn't have known of the issues in the statements creates a genuine dispute of material fact ripe for trial on the merits.

> It is not permissible for the trial judge . . . to weigh the evidence or to resolve conflicts arising from pretrial documents, affidavits, depositions or other evidence.  That is the job of the trier of fact (whether it is to be a bench trial or a jury trial) after hearing *all* the evidence, including live witness testimony that, as here, may be in conflict.  This is an axiom of the judicial process and applies unless the parties have stipulated that the paper record shall constitute the trial record.[133]

Thus, the Court cannot resolve this conflicting evidence; there remains a genuine dispute over Ms. Marcotte's knowledge, which prohibits summary judgment.

### 2. The Court cannot now decide whether Defendants' reliance was justifiable.

Jiggy also targets the fact that the Defendants knew about some of the

---

[129]  *Columbus Life*, 2023 WL 1956868, at *8.

[130]  Defs.' Opp'n, at 17.

[131]  Marcotte 10/21 Tr., at 312–315.

[132]  Marcotte 11/7 Decl., at ¶ 8.

[133]  *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1149 (Del. 2002) (citations omitted).

double-counting.[134]   Because of this, Jiggy contends that there can be no justifiable reliance by the Defendants to make out the fourth fraud element.[135] The Defendants respond that they didn't know the extent of the overstated revenues.[136]

"[W]hether one's reliance was reasonable generally is a question of fact that cannot be determined on summary judgment."[137]   But whether reliance is justified is an objective test.[138]   And "[t]o establish justifiable reliance, [a plaintiff] must demonstrate he did not have either the awareness or opportunity to discover the accurate information."[139]

Here, when the Defendants discovered problems with the reports, they disclosed them to Ms. Marcotte and DBD and worked with Ms. Marcotte to fix them.[140]  According to the Defendants, they only discovered the full extent of the double counting in August 2024.[141]   Conversely, Jiggy highlights evidence

---

[134]  Jiggy Op. Br., at 7–8.

[135]  *Id.* at 7–12.

[136]  Defs.' Opp'n,, at 20.

[137]  *Vague v. Bank One Corp.*, 2004 WL 1202043, at *1 (Del. May 20, 2004) (citing *Wilm. Tr. Co. v. Aetna Cas. & Sur. Co.*, 690 A.2d 914, 916 (Del. 1996)).

[138]  *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *23 (Del. Ch. Mar. 9, 2022).

[139]  *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018) (quoting *Tekstrom, Inc. v. Savla*, 2006 WL 2338050, at *11 (Del. Super. Ct. July 31, 2006)).

[140]  Defs.' Opp'n, at 20.

[141]  Brzeczek Tr., at 163–164, 166–168, 175.

suggesting that the Defendants knew the full extent of the misreporting.[142] Again, this conflicting evidence creates a dispute of fact that prevents summary judgment.

### 3. But Steelhead's fraud counterclaim seeks identical damages to its breach-of-contract counterclaim and is based on identical facts.

Jiggy asserts that Steelhead's fraud counterclaim fails as it seeks identical damages to the breach-of-contract counterclaim and the counterclaim doesn't seek recessionary damages.[143] The Defendants reply that the fraud damages are disputed, so summary judgment is inapplicable.[144]

To plead a fraud claim successfully, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's action.[145] The damages allegations can't rehash the damages allegedly caused by breach of contract.[146]

---

[142] Jiggy Op. Br., 9–12 (citing to messages showing that the Defendants knew of the extent of the accounting issues before closing); *see, e.g.,* Bennett Op. Aff., Ex. 10, at SAEE_01077852 ("i dont think they are lying, i think they did some shady adjustments we need to unravel"); *id.*, Ex. 11, at SAEE_01077871 ("I don't want to put [Jiggy] onto their numbers being wrong"); *id.*, Ex. 16, at SAEE_01109614 ("these numbers are super off from the financials" . . . "We'll talk with the accountants who maintain qbo tomorrow to see what is going on . . . But good lord that's not close . . . This p&l is not helpful at all"); *id.*, Ex. 12, at SAEE_01092189 ("dbd's [P&L] is shit, i dont think we should use it").

[143] Jiggy Op. Br., at 12, 15–16; Pl. Jiggy Puzzles, LLC's Reply Br. in Further Supp. of its Mot. for Partial Summ. J.[hereinafter "Jiggy Reply"], at 10–12 (D.I. 118).

[144] Defs.' Opp'n, 23.

[145] *Novipax Holdings LLC v. Sealed Air Corp.*, 2017 WL 5713307, at *14 (Del. Super. Ct. Nov. 28, 2017) (citing *ITW Glob. Invest. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.,* 2015 WL 3970908, at *5 (Del. Super. Ct. Jun. 24, 2015)).

[146] *Id.*

- 30 -

Moreover, one cannot "bootstrap a claim of breach of contract into a claim for fraud by alleging that a contracting party never intended to perform its obligations."[147]  In other words, a plaintiff cannot adequately state a fraud claim merely by adding the term "fraudulently induced" to a breach-of-contract claim.[148]  And Delaware law requires that a fraud claim plead qualitatively different damages—such as rescission or rescissory damages—reflecting a harm independent of the contractual expectancy; absent such distinct damages, a fraud claim impermissibly bootstraps the breach-of-contract claim and cannot move forward.[149]

Here, Steelhead's fraud counterclaim seeks neither recessionary nor punitive damages to differentiate the fraud damages from the breach-of-contract damages.[150]  On top of that, the fraud counterclaim merely overlaps its breach-of-contract counterclaim.

---

[147]  *Id.* (quoting *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010)).

[148]  *Id.*

[149]  *See, e.g., Firmenich Inc. v. Nat. Flavors, Inc.*, 2020 WL 1816191, at *6–9 (Del. Super. Ct. Apr. 7, 2020).  In *Firmenich*, this Court reaffirmed that a fraud claim cannot proceed alongside a breach-of-contract claim where the plaintiff fails to plead damages distinct from contract damages. Relying on *EZLinks*, the Court explained that failure to plead separate fraud damages is an independent ground for dismissal and that a request for punitive damages alone is not a separate injury.  *Id.* at *5.  By contrast, the court acknowledged that *ITW Global Investments Inc.* and *Novipax Holdings LLC* recognize that rescission or rescissory damages can distinguish fraud damages from contract damages where such relief is actually sought.  *Id.* at *6–8.

[150]  *See generally* Steelhead's Countercl., at 82–85.

- 31 -

In its fraud counterclaim, Steelhead avers that "[p]rior to the acquisition, Jiggy intentionally concealed and misrepresented its true revenue in order to induce Steelhead's reliance and ensure that Steelhead bought the Jiggy business," and "[p]rior to the acquisition, Jiggy intentionally concealed and misrepresented its pre-existing debts, liabilities, and other operational problems in order to induce Steelhead's reliance and ensure that Steelhead bought the Jiggy business."[151] Similarly, the breach-of-contract counterclaim concerns the APA's representations and warranties, and alleges that "Jiggy breached section 4.21 of the APA through its non-disclosure of pre-existing liabilities and debts," and "Jiggy breached section 4.19 of the APA through its failure to provide financial documentation according to Generally Accepted Accounting Principles."[152] And more, the breach-of-contract counterclaim says that "Jiggy breached section 4.20 of the APA by failing to conduct its business in the ordinary course, consistent with past practices—specifically, shortly before the closing, Jiggy decreased marketing expenditures and artificially accelerated sales to inflate revenue, boost the appearance of profitability, and personally benefit Ms. Marcotte."[153]

So precisely the same facts undergird the breach-of-the-representations

---

[151] *Id*., at ¶¶ 97–98; *see also* Brzeczek Tr., at 163–164.

[152] *Id*., at ¶¶ 92–93.

[153] *Id*., at ¶ 90.

and the fraud-in-the-inducement counterclaims with no difference in damages pled or sought.[154] Accordingly, Steelhead's fraud counterclaim simply sounds in contract. It is impermissibly bootstrapped onto Steelhead's breach-of-contract counterclaim. Summary judgment is **GRANTED** on Jiggy's Motion for Summary Judgment on Steelhead's Counterclaim Count II (Fraud).

### 4. Aestuary's sole fraud counterclaim survives since Aestuary doesn't assert a breach-of-contract claim.

Aestuary's sole counterclaim is fraud.[155] So there is no bootstrapping issue for Aestuary.[156] And there remains a genuine dispute as to material facts that prevents judgment on this counterclaim as a matter of law. Therefore, Jiggy's Motion for Summary Judgment on Aestuary's Counterclaim is **DENIED**.

### E. STEELHEAD'S BREACH-OF-CONTRACT COUNTERCLAIM SURVIVES.

Jiggy moves for summary judgment on Steelhead's breach-of-contract counterclaim since the elements of a breach-of-contract claim fail as a matter of

---

[154] The standard remedy for breach of contract is expectation damages that would "put the promisee in the same position as if the promisor had performed under the contract." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001). And Steelhead's fraud counterclaim seeks these same damages.

[155] *See* Aestuary's Countercl., at ¶¶ 54–59.

[156] *See Levy Fam. Inv'rs, LLC v. Oars + Alps LLC*, 2022 WL 245543, at *8 (Del. Ch. Jan. 27, 2022) ("Thus, the anti-bootstrapping rule does not prevent parties from bringing a fraud claim if . . . there is no breach claim on which to bootstrap the fraud claim.") (quotations omitted).

law.[157] Jiggy attacks each alleged breach in piecemeal fashion.[158]

To prevail on a breach-of-contract claim, one must show: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages.[159] The plaintiff must establish an "express contractual obligation that was breached" to proceed on a breach-of-contract claim.[160]

### 1. There is evidence to support the APA § 2.1(d) counterclaim.

APA Section 2.1(d) provides that Seller "shall sell, convey, assign, transfer and deliver or cause to be delivered, to Purchaser . . . all Transferred Technology, which, for the avoidance of doubt, includes without limitation the Technology set forth on <u>Schedule 2.1(d)</u>."[161] Schedule 2.1(d) includes JTB Custom Software for on-demand printing, all Jiggy puzzle specifications, all Jiggy rigid box specifications, all Jiggy product specifications, and all Jiggy template CAD files.[162] Steelhead contends that it didn't receive certain puzzle dye design files, large items on the Kay Accounts sheet, or control over Jiggy's Google Ads and Stripe accounts, and there are text messages and emails to support this.[163]

---

[157] Jiggy Op. Br., 16–21.

[158] *Id.*

[159] *See VLIW Tech., LLC v. Hewlett-Packard, Co.*, 840 A.2d 606, 612 (Del. 2003).

[160] *Talkdesk, Inc. v. DM Trans, LLC*, 2024 WL 2799307, at *4 (Del. Super. Ct. May 31, 2024) (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006)).

[161] APA § 2.1(d).

[162] APA Schedule 2.1(d).

[163] Cumings Opp'n Aff., Ex. 17 [hereinafter "Account Sheet Texts"] at SAEE_01093372; *id.*,

While Jiggy points to things that may weaken the Steelhead's evidence, the Court does not weigh extant evidence at summary judgment.[164] The parties have not stipulated that the paper record constitutes the trial record. So the Court is not licensed to determine which party's evidence is more credible or persuasive at this point.[165]

In addition, Steelhead has identified damages stemming from this breach.[166] Steelhead asserts that, because of these missing items, it was forced to reverse-engineer specifications, rebuild documentation from scratch, and commission new puzzle dies at its own expense—only to receive the underlying materials weeks later, after the new dies had already been produced, causing product-consistency risks and unnecessary capital outlays.[167] There is also documentation underpinning damages.[168] Because there is evidence to support the each contract-breach element, that counterclaim of Steelhead's survives.

---

Ex. 18A–C [hereinafter "Google Ads Texts"] at JIGGY002710–12 (D.I. 106); *See generally id.*, Ex. 14 [hereinafter "Sample Feedback Emails"].

[164] *See* Jiggy Reply, at 13–15.

[165] *Cerberus*, 794 A.2d at 1149.

[166] Defs.' Opp'n, at 24–25.

[167] *See generally* Sample Feedback Emails.

[168] *See, e.g.,* Google Ads Texts ("ADs have stopped running bc we don't have proper access and can't update billing.").

**2. There is evidence to support the APA §§ 2.3, 4.19, 4.20, and 4.21 counterclaims.**

Jiggy similarly attacks these breach-of-contract counterclaims saying there is neither a breach nor damages.[169]

APA Section 4.19 represents that Jiggy's financial records "fairly present, in conformity with GAAP applied on a consistent basis . . . the financial position of [Jiggy]."[170] Section 4.20 warrants that Jiggy's business "has been conducted in the ordinary course consistent with best practices and there has not been any event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect."[171] And Section 4.21 submits that "[t]here are no Liabilities with respect to the Business or the Purchased Assets of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such Liability . . ." with specific carve-outs.[172] Absent listed exceptions in the APA, Steelhead didn't assume any Liability.[173]

Like the fraud counterclaims that are identical to these breach-of-contract

---

[169] Jiggy Op. Br., at 18–21.

[170] APA § 4.19.

[171] *Id.* § 4.20.

[172] *Id.* § 4.21.

[173] *Id.* § 2.3.

counterclaims, there are disputed material facts that prevent summary judgment. First, there is evidence to corroborate that the financial statements did not fairly present the business, as there was double-counting and Steelhead discovered the full extent of this in August 2024.[174] On that same note, Steelhead points to evidence that the business wasn't conducted in the ordinary course because Jiggy reduced marketing spending and accelerated billing and collection before closing.[175] This caused a drop in B2B revenue after closing.[176] And after closing, Steelhead discovered approximately $20,000 in unpaid artist royalties and additional outstanding pre-closing vendor invoices—totaling roughly $50,000— that had not been disclosed during diligence.[177] So there is evidence of breaches of these contract provisions.

Steelhead identifies damages from these breaches in the form of product-consistency risks, unnecessary capital delays, B2B revenue drops, damage to vendor relationships, unexpected cash-flow burdens, paid invoices, and financial damages.[178] There is a capital report showing that, after closing, there were

---

[174] Brzeczek Tr., at 163–164, 175.

[175] Cumings Opp'n Aff., Ex. 16 [hereinafter "Freshbooks Jiggy Invoices August 2023"]; *id.*, Ex. 19 [hereinafter "Monthly Meta Spend"].

[176] *See* Freshbooks Jiggy Invoices August 2023 (showing that Jiggy issued invoices on the two days before closing and collected from large B2B customers).

[177] Cumings Opp'n Aff. Opp'n, Exs. 15A–B [hereinafter "Closing Working Capital Report"].

[178] *See* Defs.' Opp'n, at 23–26; Brzeczek Aff., at ¶¶ 7–8 and Ex. 6; Cumings Opp'n Aff., Ex. 20.

unpaid artist royalties incurred before closing, as well as roughly $50,000 in further undisclosed pre-closing obligations.[179]

The issue of damages is typically left for the jury.[180] Any unexcused failure to perform a contract is a legal wrong.[181] And if one "sufficiently pleads facts which, if true, show the 'existence' of damages, arguments as to the 'amount' of damages do not justify granting summary judgment."[182]

### 3. There is evidence to support the APA § 7.2 counterclaim.

Likewise, there is evidence supporting the counterclaim for breach of the APA confidentiality provision. Section 7.2 prohibits Jiggy from directly or indirectly issuing any statement to a third party regarding the existence of the APA.[183] That notwithstanding, Jiggy publicly filed its complaint on October 17, 2024, and attached an unredacted copy of the APA.[184] And Steelhead insists that this public disclosure materially harmed its ability to negotiate future acquisitions

---

[179] *See* Closing Working Capital Report.

[180] *Cercacor Labs.*, 2025 WL 1180186, at *14.

[181] *Medlink Health Sols., LLC v. JL Kaya, Inc.*, 2024 WL 1192781, at *6 (Del. Super. Ct. Mar. 20, 2024).

[182] *LG Elecs. Inc. v. Invention Inv. Fund I, L.P.*, 2024 WL 4675050, at *6 (Del. Super. Ct. Sept. 25, 2024) (quoting *Medlink Health Sols.*, 2024 WL 1192781, at *5; *see also Torrent Pharma, Inc. v. Priority Healthcare Distrib., Inc.*, 2022 WL 3272421, at *13 (Del. Super. Ct. Aug. 11, 2022) (recognizing that Delaware courts generally make the wrongdoer bear the risk of uncertainty in damages calculation and may infer nominal damages from a contractual injury).

[183] APA § 7.2(b).

[184] D.I. 1.

because counterparties could then (and presumably now) examine specific terms, pricing structures, and previous concessions.[185]

Jiggy maintains that this claim fails for lack of damages and cites *Kronenberg v. Katz*.[186] Not so.

There, the counterclaimants contended that the plaintiffs breached a confidentiality provision by filing a public lawsuit that named the counterclaimants.[187] The Court dismissed the claim at summary judgment because "[a]t no time during the course of this litigation [have the counterclaimants] pointed to specific portions of the record that contain specific proprietary information or sensitive personal information that would justify sealing particular portions of the record, much less indicated how the mere fact of this business dispute itself can be concealed from the public."[188]

Here, Steelhead highlights the commercial sensitivity of the APA for bargaining purposes, which could justify sealing portions of it.[189] In fact, the Court has allowed filings under seal in this case after Jiggy publicly filed its initial

---

[185] Defs.' Opp'n, 29.

[186] 872 A.2d 568 (Del. Ch. 2004).

[187] *Kronenberg*, 872 A.2d at 575.

[188] *Id.*

[189] Defs.' Opp'n, 29.

complaint.[190] This was missing from *Kronenberg*.[191] Accordingly, Steelhead has identified a breach and damages flowing from that breach. Jiggy's Motion for Summary Judgment on Steelhead's Counterclaim Count I (Breach of Contract) is **DENIED**.

## F. A LEANER VERSION OF STEELHEAD'S IMPLIED-COVENANT COUNTERCLAIM SURVIVES.

Again, every contract contains an implied covenant of good faith and fair dealing. And again, the implied covenant requires "'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain."[192] The implied covenant allows a court to infer contractual obligations "that neither party anticipated."[193] A complainant must allege three elements to state a claim for breach of the implied covenant: (1) a specific obligation implied in the contract; (2) a breach of that obligation; and (3) resulting damages.[194]

---

[190] D.I. 8; D.I. 10.

[191] *See Kronenberg*, 872 A.2d at 606–07 ("As a result, the parties to the LLC Agreement knew that the nature of any dispute among themselves would become public *unless the dispute involved matters of such commercial or personal sensitivity* as to justify placing the entire record under seal—an eventuality that is highly improbable when the dispute simply involves accusations of wrongdoing among business partners.") (emphasis added).

[192] *Dunlap*, 878 A.2d at 442 (quoting *Wilgus*, 498 A.2d at 159).

[193] *CMS Inv. Holdings, LLC v. Castle*, 2015 WL 3894021, at \*15 (Del. Ch. June 23, 2015).

[194] *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at \*3 (Del. Ch. Jan.

Courts will not infer an obligation exists that contradicts a clearly permissible exercise of an express contractual right.[195] And it is the express contractual language that controls; not a party's actions implementing a contract.[196] A court might rightly infer an obligation "when the express terms of the contract indicate that the parties would have agreed to the obligation had they negotiated the issue, [so] the plaintiff must advance provisions of the agreement that support this finding in order to allege sufficiently a specific implied contractual obligation."[197]

But the covenant will not be employed to "infer language that contradicts a clear exercise of an express contractual right" or engage in "post contractual rebalancing of the economic benefits flowing to the contracting parties."[198] To reiterate, the covenant applies "only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer."[199]

---

30, 2015).

[195] *Nemec*, 991 A.2d at 1127.

[196] *Id.* at 1126.

[197] *Fitzgerald*, 1998 WL 842316, at *1 (footnote omitted).

[198] *Nemec*, 991 A.2d at 1127–28.

[199] *Airborne Health*, 984 A.2d at 146.

### 1. The implied-covenant counterclaim cannot be based on pre-closing conduct.

Steelhead's counterclaim paragraph 107 says "[t]he APA also included an implied provision that Ms. Marcotte would not make false verbal representations, concealments, or omissions that would materially impact Steelhead's decision on whether to acquire Jiggy."[200] Acts that would impact Steelhead's decision to enter into the APA would have to arise pre-APA.

Jiggy asserts that an implied-covenant claim cannot be based on pre-contract conduct.[201] Jiggy cites to the United States District Court for the District of Columbia case *Intelsat USA Sales Corporation v. Juch-Tech, Incorporated*.[202] *Intelsat* instructs: "The implied covenant of good faith and fair dealing 'relates only to the performance of obligations under an extant contract, and not to any pre-contract conduct.'"[203] In the federal appeals court case *Intelsat* cites, the Second Circuit held that, under New York law, an implied covenant relates only to the performance of obligations under an extant contract, and not any pre-contract conduct.[204]

---

[200] Steelhead's Countercl., at ¶ 107.

[201] Jiggy Op. Br., 23.

[202] 24 F. Supp. 3d 32 (D.D.C. 2014).

[203] *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 24 F. Supp. 3d 32, 43 (D.D.C. 2014) (quoting *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 941 (2d Cir. 1998)).

[204] *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 941 (2d Cir. 1998).

While no Delaware case has expressly said so, several other jurisdictions have expressed the rule that pre-contractual conduct cannot serve as the basis for an implied-covenant claim.[205] "Particular forms of bad faith in bargaining are the subjects of rules as to capacity to contract, mutual assent and consideration and of rules as to invalidating causes such as fraud and duress."[206] Applying this sensible rule, the Court finds that an actionable breach of the implied covenant cannot be based on pre-contract conduct, since the contract had not yet existed. Thus, Jiggy's motion for summary judgment is **GRANTED** to excise Steelhead's Counterclaim allegation of a breach of the implied covenant that is based wholly on pre-contract actions.[207]

### 2. Most of the remainder of the implied-covenant counterclaim is expressly covered by the APA and the breach-of-contract counterclaim.

The implied-covenant counterclaim also asserts that the APA included

---

[205] *RBS Citizens, Nat. Ass'n v. RTG-Oak Lawn, LLC*, 943 N.E.2d 198, 207 (Ill. App. Ct. 2011) ("The duty of good faith and fair dealing, however, does not arise out of precontractual actions and is only applicable to the conduct of parties to an existing contract."); *Bonfield v. AAMCO Transmissions, Inc.*, 717 F. Supp. 589, 593–94 (N.D. Ill. 1989) (dismissing portion of implied-covenant claim where claim rested on precontractual negotiations); *Terranova v. Terranova*, 883 F. Supp. 1273, 1277 n.2 (W.D. Wis. 1995) (noting that, under both Wisconsin and California law, the implied covenant only extends to the performance of a contract and not precontractual negotiations); *Contreras v. Master Fin., Inc.,* 2011 WL 32513, at *3 (D. Nev. Jan. 4, 2011) ("[A]n implied covenant relates only to the performance of obligations under an extant contract, and not to any pre-contract conduct."); *see also Young v. Allstate Ins. Co.*, 198 P.3d 666, Hawai'i 403, 690–91 (2008) (indicating the covenant of good faith does not extend to activities before consummation of an insurance contract).

[206] RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. c (A.L.I. 1981).

[207] Steelhead's Countercl., at ¶ 107.

implied provisions that prohibited "[Ms.] Marcotte from accepting further payments from customers for her personal benefit after the close of the acquisition" and "intentionally attempt[ing] to disrupt Jiggy's profitability and long term success after the close of the acquisition for her own personal gain."[208] Jiggy contends that these obligations are "clearly articulated in the APA."[209]

"Where the questioned contract expressly addresses a particular matter, 'an implied covenant claim respecting that matter is duplicative and not viable.'"[210]

Here, the APA required transfer of "all accounts or notes receivable held by Seller," and "all Contracts and other instruments . . . including sale and purchase orders."[211] And APA Section 2.1(d) provides that Seller "shall sell, convey, assign, transfer and deliver or cause to be delivered, to Purchaser . . . all Transferred Technology, which, for the avoidance of doubt, includes without limitation the Technology set forth on Schedule 2.1(d)."[212]

APA Section 2.1 expressly covers the portion of the counterclaim that alleges that Ms. Marcotte breached the implied covenant by retaining and

---

[208] Steelhead's Countercl., at ¶¶ 105, 106.

[209] *See* Jiggy Reply, 20.

[210] *Brightstar Corp. v. PCS Wireless, LLC*, 2019 WL 3714917, at *11 (Del. Super. Ct. Aug. 7, 2019) (quoting *Edinburgh Holdings, Inc. v. Education Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018)).

[211] APA §§ 2.1(a), (g).

[212] *Id.* § 2.1(d).

depositing customer payments owed to Steelhead and failing to perform key transition responsibilities.[213] These facts support a breach-of-contract counterclaim, not a separate implied-covenant counterclaim. As a result, Jiggy's motion for summary judgment is **GRANTED** to excise Steelhead's Counterclaim allegation at paragraph 105 because the APA breach-of-contract counterclaim covers the transition obligations.

The only remaining part of the implied-covenant counterclaim is the implied obligation that Ms. Marcotte wouldn't "intentionally attempt to disrupt Jiggy's profitability and long term success after the close of the acquisition for her own personal gain."[214] In support, Jiggy points to the fact that Ms. Marcotte advocated for initiatives that favored short-term revenue or her own earnout potential over the long-term health of the business, including proposals that would have resulted in negative margins.[215] This is a valid implied-covenant counterclaim that states an implied provision and is based on post-negotiation conduct. A reasonable factfinder could find that Ms. Marcotte took certain actions for her own personal gain in violation of the implied covenant that she not to favor herself over Jiggy's long-term success. So summary judgment is

---

[213] Defs.' Opp'n, 31–32.

[214] Steelhead's Countercl., at ¶ 106.

[215] Defs.' Opp'n, 32; Brzeczek Aff., at ¶¶ 28–32; Brzeczek Aff., Ex. 9 (D.I. 90).

**DENIED** as to this allegation supporting Steelhead's Implied-Covenant Counterclaim found at Paragraph 106. Accordingly, Jiggy's motion for summary judgment on Steelhead's implied-covenant counterclaim is **GRANTED in part, and DENIED in part**.

### G. THE DEFENDANTS' AFFIRMATIVE DEFENSES PRESENT A MIXED BAG OF PLEADING ISSUES THAT CAN BE ADDRESSED THROUGH PROPER TRIAL INSTRUCTIONS.

#### 1. This Court doesn't have jurisdiction over an unclean hands defense.

The Superior Court "is a court of law and does not provide affirmative equitable relief as that jurisdiction lies exclusively with the Delaware Court of Chancery."[216] Delaware courts often recognize that laches and unclean hands are unavailable at law.[217] The reason is that such defenses answer only equitable claims.[218] Therefore, Jiggy's motion for summary judgment is **GRANTED** on this affirmative defense because the Court doesn't have jurisdiction over Affirmative Defense 9.

---

[216] *Avaya, Inc. v. Charter Commc'ns Holding Co., LLC*, 2015 WL 1975814, at *3 (Del. Super. Ct. May 1, 2015).

[217] *Dyton v. Ahern*, 2025 WL 3232911, at *7 (Del. Super. Ct. Nov. 19, 2025), *reargument denied,* 2025 WL 3496991 (Del. Super. Ct. Dec. 5, 2025); *see also Mine Safety Appliances Co. v. AIU Ins. Co.*, 2016 WL 498848, at *12 (Del. Super. Ct. Jan. 22, 2016) ("Laches is an equitable defense that is not available in the Superior Court, which is a court of law.").

[218] *Dyton*, 2025 WL 3232911, at *7.

2. **But this Court has jurisdiction over the waiver and estoppel defense, and dismissing these defenses is generally inappropriate at summary judgment.**

On the other hand, the Court has jurisdiction over the equitable defense of waiver and estoppel. "For instance, Superior Court Rule 8(c) includes waiver and estoppel as affirmative defenses."[219] As a result, the Court has jurisdiction over these defenses.

Still, the Court may have occasion to determine if these defenses have merit at summary judgment.[220] "'Waiver is the voluntary and intentional relinquishment of a known right' either conferred by statute or secured by contract."[221] "Estoppel depends on what a party caused another to do, and involves an element of reliance."[222] Estoppel "'arises when, by its conduct, a party intentionally or unintentionally leads another, in reliance on that conduct, to change position to his detriment.'"[223] "'The question of waiver is normally a jury question, unless the facts are undisputed and give rise to only one reasonable

---

[219] *Id.*

[220] *See Paragon Metal Holdings, LLC v. Smith*, 2025 WL 524265, at *10 (Del. Super. Ct. Jan. 28, 2025) (noting, at summary judgment, that the defendant shoulders the burden to prove its affirmative defenses).

[221] *Roam-Tel P'rs v. AT&T Mobility Wireless Operations Holdings Inc.*, 2010 WL 5276991, at *9 (Del. Ch. Dec. 17, 2010) (quoting *Realty Growth Investors v. Council of Unit Owners,* 453 A.2d 450, 456 (Del. 1982)).

[222] *Id.* (citing DONALD J. WOLFE AND MICHAEL A. PITTENGER. CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 11.02, at 11–14 (2009)).

[223] *In re Coinmint, LLC*, 261 A.3d 867, 894 (Del. Ch. 2021) (quoting *Roam-Tel P'rs*, 2010 WL 5276991, at *9).

- 47 -

inference.'"[224] And "[u]nless only one inference can be drawn from the evidence, the existence of estoppel is a question to be determined by the trier of fact."[225]

Here, there are competing fraud and breach-of-contract claims amongst the parties. There are several material factual disputes. And these defenses involve these disputed questions of fact—such as, whether Jiggy committed fraud in the lead up to the APA, if Ms. Marcotte knew about the alleged double-counting, or if there was reasonable reliance by any of the parties. Thus, Jiggy's motion for summary judgment is **DENIED** on Affirmative Defense 18.

### 3. Denials of a claim's elements aren't affirmative defenses.

Steelhead's and Aestuary's affirmative defenses 2, 4, 14, 15, and 16 involve denials of elements of Jiggy's claims.[226] "A denial of an element of a claim is not an affirmative defense."[227] While these defenses shouldn't be listed as affirmative defenses, Jiggy still bears the burden to prove the elements

---

[224] *Specialty Dx Holdings, LLC v. Lab. Corp. of Am. Holdings*, 2021 WL 6327369, at *10 (Del. Super. Ct. Dec. 16, 2021) (quoting *Mergenthaler v. Hollingsworth Oil Co. Inc.*, 1995 WL 108883, at *2 (Del. Super. Feb. 22, 1995)); *see also George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224 (Del. 1975) ("It is for the jury to say whether plaintiff's conduct under the circumstances of this case evidenced an intentional, conscious and voluntary abandonment of his claim or right.").

[225] *Dervaes v. H.W. Booker Constr. Co.*, 1980 WL 333053, at *10 (Del. Super. Ct. May 28, 1980).

[226] The listed affirmative defenses are injury caused by Plaintiff's conduct, no injury from Defendant's conduct, absence of false representation, lack of intent to defraud, and absence of reasonable reliance, respectfully. Aestuary's Countercl. and Steelhead's Countercl., 53–56.

[227] *Paragon Metal Hldgs.*, 2025 WL 524265, at *10 n.156.

addressed to prove its claim. These denials will not be identified at trial as Affirmative Defenses[228] but the jury will be instructed on the elements of Jiggy's claims and Jiggy's burden in proving those elements. So, in effect, Jiggy's summary judgment motion on Steelhead's and Aestuary's identification of affirmative defenses 2, 4, 14, 15, and 16 as such is **GRANTED**. But the practical effect of that small victory is nil.

### 4. Justification isn't a defense to breach of contract or fraud.

Jiggy also moves for summary judgment on the Defendants' affirmative defense of justification.[229] The Defendants don't appear to respond to this, nor do they identify any rule, caselaw, or statute that says justification can be an affirmative defense to breach of contract or civil fraud.[230] So such as it is, Jiggy's motion for summary judgment on Affirmative Defense 7 is **GRANTED**.

### 5. The failure-to-plead-fraud-with-particularity affirmative defense is moot.

Finally, Jiggy lists the Defendants' Affirmative Defense 13 in its brief.[231] This Affirmative Defense says that Jiggy failed to plead fraud with particularity as required by Rule 9.[232] But the Defendants don't argue that Jiggy's fraud claim

---

[228] *See id.*

[229] Jiggy Op. Br., at 26.

[230] *See* Defs.' Opp'n, at 34.

[231] Jiggy Op. Br., at 26.

[232] Aestuary's Countercl. and Steelhead's Countercl., at 55.

is invalid under Rule 9—a pleading rather than trial issue—in their motions for summary judgment.  As such, at this point the issue is moot.

## V.  CONCLUSION

For the foregoing reasons and in the manner expressly set forth above, the Court:  **GRANTS, in part, and DENIES, in part,** Steelhead's Motion for Partial Summary Judgment;  **DENIES** Aestuary's Motion for Partial Summary Judgment; and **GRANTS, in part, and DENIES, in part,** Jiggy's Motion for Partial Summary Judgment.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____

Paul R. Wallace, Judge

Original to Prothonotary

cc:  All parties and Counsel of Record